STATE of Wisconsin, Plaintiff-Appellant,

v.

Shonna HOBSON, Defendant-Respondent.

Supreme Court

*No. 96–0914–CR. Oral argument December 15, 1997.—Decided May 27, 1998.*

(On certification from the court of appeals.)

(Also reported in 577 N.W.2d 825.)

For the plaintiff-appellant the cause was argued by *Gregory M. Posner-Weber,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

For the defendant-respondent there was a brief by *Keith A. Findley, John A. Pray* and *University of Wisconsin Law School,* Madison and oral argument by *Keith A. Findley.*

Amicus Curiae was filed by *Suzanne Hagopian,* assistant state public defender, Madison, for the Office of the State Public Defender.

Amicus Curiae was filed by *Dean A. Strang* and *Fitzgerald & Strang, S.C.,* Milwaukee for the Wisconsin Association of Criminal Defense Lawyers.

¶ 1.   JANINE P. GESKE, J.   The question certified to this court is whether Wisconsin recognizes a common law right to forcibly resist an unlawful arrest. In this case, the State does not challenge the circuit court's determination that Beloit police officers lacked probable cause to arrest the mother of a five-year-old boy after she refused to allow officers to speak to her son about a stolen bicycle. When the officers decided to arrest the mother for obstruction of an officer, the mother resisted and struck one of the officers. This action resulted in her arrest for an additional charge of battery to a peace officer. On certification the State, while denying that a common law privilege to forcibly resist an unlawful arrest has ever existed in Wisconsin,

352

asks us to abrogate[1] that privilege and also seeks reversal of the order dismissing the battery charge.

¶ 2.  We conclude, based on the common law in this state, that Wisconsin has recognized a privilege to forcibly resist an unlawful arrest in the absence of unreasonable force. However, based upon public policy, we now decide to abrogate that common law affirmative defense. Our decision to abrogate has prospective application only. We therefore affirm the order of the circuit court dismissing the battery charge against Ms. Hobson.

## I.  FACTS AND PROCEDURAL HISTORY

### 1.  Facts underlying charges of obstruction and disorderly conduct

¶ 3.  The facts recited herein are taken from the complaint and testimony at the hearing on the motion to dismiss. The defendant, Ms. Shonna Hobson was the mother of a five-year-old boy. On July 31, 1995, a member of the Beloit Police Department, Officer Nathan Shoate, went to a home address to interview a child suspected in a bike theft. Another juvenile had reported to Officer Shoate that he had seen Ms. Hobson's son riding the juvenile's sister's stolen bicycle. When Officer Shoate reached the address reported by the juvenile, he saw Ms. Hobson's son near a bicycle. When the officer got out of his car, he saw Ms. Hobson's son run upstairs.

¶ 4.  The juvenile who had reported the theft was in Officer Shoate's car at the time. The juvenile pointed out Ms. Hobson's son as the person he had seen on the stolen bicycle. Officer Shoate met Ms. Hobson at her

---

[1] To 'abrogate' is defined as "To annul, cancel, revoke, repeal, or destroy." Black's Law Dictionary 8 (6th ed. 1990).

home, and told her that her son was suspected in a bike theft. Specifically, the officer told Ms. Hobson that her son was seen on a stolen bike and that the officer would need to talk to the boy about where the boy got the bike.

¶ 5. Ms. Hobson told her son to go in the house. She then told Officer Shoate that her son was not on a bicycle, and that he had his own bike. Ms. Hobson, according to the officer, became a bit irritated, and refused to allow Officer Shoate to speak with her son. She said that her son did not do anything, and had not stolen any bike. Officer Shoate then told Ms. Hobson that he would have to take her son to the police station to be interviewed about the stolen bicycle, and gave Ms. Hobson the opportunity to go along to the station. She replied that the officer was not taking her son anywhere.

¶ 6. At that point in the conversation, because of Ms. Hobson's resistance, Officer Shoate called for backup police officers to assist him. Shortly thereafter, Officers Eastlick, Anderson and Alisankus arrived at the Hobson address. According to Officer Eastlick's report, when the three backup officers arrived Ms. Hobson was standing with her son on the front steps of her residence yelling, swearing and saying "bullshit" in a very loud voice. Officer Shoate then repeated to Ms. Hobson that they had to take her son to the police station, to which Ms. Hobson again replied "You aren't taking my son anywhere." Officer Shoate then advised Ms. Hobson that she was under arrest for obstructing an officer.

2. Facts giving rise to charge of resisting an officer

¶ 7. Officers Eastlick and Alisankus proceeded to attempt to handcuff Ms. Hobson. When Officer Eastlick tried to take hold of Ms. Hobson's arm and

advise her that she was under arrest, Ms. Hobson pushed the officer away. Ms. Hobson became combative and struck Officer Alisankus across the face. Ms. Hobson then was taken to the ground by other officers. Both Officers Shoate and Eastlick reported that once she was on the ground, Ms. Hobson continued to fight with Officer Alisankus and kicked at Officer Eastlick.

### 3. Facts giving rise to charge of resisting arrest and battery to a peace officer

¶ 8.   On August 1, 1995, Ms. Hobson was charged with obstructing an officer, disorderly conduct, and resisting an officer.[2] In an amended complaint filed August 15, 1995, the prosecutor added a fourth count. The amended complaint also charged Ms. Hobson with the felony of causing intentional bodily harm (battery) to a peace officer.[3] The amended complaint included a report by Officer Alisankus, stating that he assisted other officers in arresting Ms. Hobson for obstructing at her residence. He reported that Officer Shoate advised Ms. Hobson that she was under arrest for obstructing, and that Officer Eastlick then attempted to take Ms. Hobson into custody. Ms. Hobson then forcibly pulled her arm away from Officer Eastlick, stating "let me go." Officer Alisankus then took Ms. Hobson's right hand and wrist in an effort to apply a

[2] The charges in the complaint alleged violation of Wis. Stat. §§ 946.41(1) and 947.01 (1995–96). All future statutory references will be to the 1995–96 volume, unless otherwise indicated.

[3] The battery charge of the amended complaint alleged a violation of Wis. Stat. § 940.20(2).

compliance hold.[4] At that point Ms. Hobson began to struggle and tried to pull away from Officer Alisankus. Ms. Hobson successfully pulled away and then began to swing her fist and kick at Officer Alisankus. Ms. Hobson's fist struck Officer Alisankus on the left cheek. Ms. Hobson also kicked Officer Alisankus in the left leg and right forearm. Officer Alisankus was later treated at Beloit Memorial Hospital for injuries sustained during this incident.

### 4. Motions to the circuit court

¶ 9. At the preliminary hearing on August 23, 1995, defense counsel for Ms. Hobson moved to dismiss the obstructing and resisting counts of the amended complaint. The circuit court determined at the preliminary examination that there was probable cause to arrest Ms. Hobson, and bound her over for the filing of an information.[5] *See* Wis. Stat. § 970.03. On that same day, defense counsel filed a motion to dismiss the amended complaint in its entirety for lack of personal jurisdiction, and alternatively to suppress evidence arising from Ms. Hobson's arrest. Defense counsel requested an evidentiary hearing to determine whether Ms. Hobson had been brought before the court as the result of an unlawful arrest.

¶ 10. On January 2, 1996 the circuit court conducted an evidentiary hearing on the motions to dismiss and suppress. The court dismissed the

---

[4] As Officer Alisankus described a compliance hold, it involves locking the individual's elbow and pushing down on the wrist while putting pressure on the fingers.

[5] Subsequently, the information was filed on August 29, 1995. Two days later, the circuit court entered a plea of not guilty on all counts on behalf of the defendant, and vacated the warrant against Ms. Hobson.

obstructing and resisting counts, finding no probable cause for Ms. Hobson's arrest. The circuit court also concluded that Ms. Hobson had a common law privilege to forcibly resist her arrest. In the circuit court's view, a "superior social policy is advanced by a rule which modifies the common law rule so as to not permit resistance to an unlawful arrest unless the health or safety of the individual or a member of his or her family is threatened in a way that is not susceptible of cure later in a court room." The circuit court also held that Ms. Hobson's actions stemming from the unlawful arrest were caused by the police. The circuit court concluded that the battery charge was incident to the unlawful arrest, and that Ms. Hobson had no intent to assault an officer, but that the police officer assaulted her.[6] The circuit court then dismissed the entire complaint.[7] The

---

[6] Although the circuit court found that the officers used physical force against Ms. Hobson, the circuit court did not find that the officers used unreasonable force.

[7] At the outset, we underscore the unusual procedural history of this case. As amicus curiae Wisconsin Association of Criminal Defense Lawyers puts it, "Ordinarily, of course, self-defense would be played out at trial and decided there." Amicus Brief at 8 n.1. Before trial Ms. Hobson moved to dismiss the criminal complaint against her. Such a motion is authorized by Wis. Stat. § 971.31(2). *See also Lampkins v. State*, 51 Wis. 2d 564, 570, 187 N.W.2d 164 (1971). Some evidence was taken at the hearing on Ms. Hobson's motion. Based on that evidence, the State, as appellant, has declined to challenge the circuit court's order for dismissal due to a lack of probable cause to arrest Ms. Hobson for disorderly conduct, resisting and obstructing. The State only seeks reversal of the order dismissing the battery charge. Simultaneously, the State asks us to abrogate the common law privilege to forcibly resist unlawful arrest. In light of our decision to abrogate that privilege prospectively, Ms. Hobson was entitled to invoke the privilege in

State appealed[8] only the dismissal of the battery charge.

¶ 11. This court is faced with two questions. First, we must ascertain whether a common law privilege to forcibly resist unlawful arrest, in the absence of unreasonable force, has existed in Wisconsin until now. Second, if that privilege exists, we must decide whether public policy is best served by continuing to recognize that privilege, or by abrogating it.

## II. ORIGIN OF COMMON LAW PRIVILEGE TO RESIST UNLAWFUL ARREST

¶ 12. The nature and scope of a common law privilege is a question of law which this court reviews de novo. *See generally Kensington Development v. Israel*, 142 Wis. 2d 894, 899–900, 419 N.W.2d 241 (1988); *State v. Deetz*, 66 Wis. 2d 1, 224 N.W.2d 407 (1974).

Our review discloses that over its 400 year history, the nature and scope of this particular privilege has

---

this case. Her act of resistance cannot both be lawful resistance and form the basis for a separate battery charge. Our conclusion in this case is limited to the narrow and peculiar procedural facts presented. Our decision does not authorize citizens faced with arrest to invoke other affirmative defenses in pretrial motions. *See, e.g., State v. Mendoza*, 80 Wis. 2d 122, 153–54, 258 N.W.2d 260 (1977) (ruling that when a reasonable construction of the evidence will support a theory that the defendant properly acted in self-defense to resist the use of unreasonable force by an arresting officer, the question goes to the jury); *State v. Kuta*, 68 Wis. 2d 641, 649, 229 N.W.2d 580 (1975) (concluding that whether conduct is privileged is a question of fact to be resolved by a jury).

[8] The State filed its appeal pursuant to Wis. Stat. § 974.05 (1)(a).

expanded and contracted based on prevailing legal and societal conditions.

■

¶ 13.    Article XIV, section 13 of the Wisconsin Constitution preserves the English common law in the condition in which it existed at the time of the American Revolution until modified or abrogated.[9] *See State v. Boehm*, 127 Wis. 2d 351, 356 n.2, 379 N.W.2d 874 (Ct. App. 1985); *see also, Davison v. St. Paul Fire and Marine Ins. Co.*, 75 Wis. 2d 190, 201, 248 N.W.2d 433 (1977).

¶ 14.    Ms. Hobson and amicus curiae Wisconsin Association of Criminal Defense Lawyers (WACDL) and the State Public Defender make numerous citations to an article by Professor Paul G. Chevigny, *The Right to Resist an Unlawful Arrest*, 78 Yale L.J. 1128 (1969). Professor Chevigny's article traces the history of the English common law privilege and its adoption in this country. *See id.* at 1129–32. The English common law right to forcibly resist unlawful arrest appeared in reported decisions as early as the 17th century. *See Rodgers v. State*, 373 A.2d 944, 947 (Md. Ct. App.) (1977). As we explain more fully below, the privilege originally was part of the right to resist any unlawful official process. Action by an official exceeding his lawful authority constituted a trespass and a provocation, and could be resisted by physical force. *See Right to Resist*, 78 Yale L.J. at 1129. If a person committed a battery against an officer when resisting arrest, it was

---

[9] Art. XIV of the Wisconsin Constitution provides:

**Common law continued in force. SECTION 13.** Such parts of the common law as are now in force in the territory of Wisconsin, not inconsistent with this constitution, *shall be* and continue part of the law of this state until altered or suspended by the legislature. (Emphasis added.)

a defense to criminal prosecution that the arrest was unlawful. If a person killed an officer when resisting arrest, it was a partial defense to criminal prosecution that the arrest was unlawful; murder was mitigated to manslaughter. *See id.*

¶ 15.   For a time, the privilege to forcibly resist unlawful arrest accrued not only to the subject of the arrest, but also to anyone who assisted him or her. In one 17th century case, a constable illegally attempted to impress a man into the army. *See Hopkin Huggett's Case*, 84 Eng. Rep. 1082 (K.B. 1666). The man initially offered no resistance, but others came to his aid and killed the constable. As Ms. Hobson notes in her brief, the majority of the *Hopkin* court initially concluded that the crime committed in the course of the rescue was manslaughter, not murder:

> if a man be unduly arrested or restrained of his liberty by three men, altho' he be quiet himself, and do not endeavour any rescue, yet this is a provocation to all other men of England, not only his friends but strangers also for common humanity sake, as my Lord Bridgman said, to endeavour his rescue[.]

On certiorari it appears, however, that the *Hopkin* judges agreed that the defendant had committed murder, but also agreed to reduce his sentence from execution to one more consistent with manslaughter. *See Hopkin*, 84 Eng. Rep. at 1083.

¶ 16.   Almost 50 years later the English court decided a seminal case on the privilege to resist unlawful arrest. A constable tried to arrest a woman because she was suspected of acting disorderly at some time in the past, although she was not acting disorderly at the time of her attempted arrest. *See The Queen v. Tooley*, 2 Ld. Raym. 1296, 92 Eng. Rep. 349, (K.B. 1710). Stran-

gers who had not seen the unlawful arrest came to assist the woman and killed the constable. At that time, a person who killed another without provocation was guilty of murder, but if provocation existed, the crime was manslaughter. The *Tooley* court reduced the charge against the strangers from murder to manslaughter, reasoning:

> a man ought to be concerned for Magna Charta and the laws; and if any one against the law imprison a man, he is an offender against Magna Charta. We seven hold this to be sufficient provocation, and we have good authority for it: in *Hopkin Huggett*'s case. . .(and this case is stronger than that).

92 Eng. Rep. at 353.

¶ 17. Reexamining *Tooley* just last year, the supreme court of Washington offered this perspective:

> The important point to note is that *Tooley* is not about Mistress Anne Dekins' right to resist her unlawful arrest. It is about the right of others, strangers, to resist her unlawful arrest. The "provocation" the *Tooley* court spoke of was not the provocation of Mistress Dekins. It was the provocation of the three strangers at seeing someone unlawfully imprisoned, and whether that provocation provided sufficient reason to reduce their conviction from murder to manslaughter. Nevertheless, the *Tooley* rule has come down to us as a rule permitting an arrestee to use the necessary force (but no more) to resist an unlawful arrest.

*State v. Valentine*, 935 P.2d 1294, 1300 (Wash. 1997) (footnote omitted).

¶ 18. As Professor Chevigny traces it, the English rule that eventually emerged was that facially valid legal process must be obeyed. *See Right to Resist,*

78 Yale L.J. at 1131. Patently unlawful legal process, on the other hand, was such a provocation that it gave rise to a privilege to forcibly resist. *See id.*

### III.  FROM THE ENGLISH RULE TO THE AMERICAN RULE

██

¶ 19.   American courts adopted the English common law rule that unlawful arrest was a justified provocation to resist with physical force.[10] American common law broadly recognized a privilege to forcibly resist an unlawful arrest throughout the 19th and 20th centuries. As identified by the United States Supreme Court, the American version had the same contours as the English version. *See Brown v. United States*, 159 U.S. 100, 102–03 (1895). The Court considered it reversible error for a trial court to fail to instruct a jury that the privilege to forcibly resist an unlawful arrest could mitigate murder to manslaughter, based on all the circumstances at the time of the killing. Five years after *Brown*, the Supreme Court reiterated that the privilege not only mitigated murder to manslaughter, but also could merit acquittal:

---

[10] Professor Chevigny notes that by adopting the English common law rule permitting forcible resistance to unlawful arrest, the American courts also imported the doctrinal difficulties in distinguishing patently unlawful arrests from arrests flawed by mere technical deficiencies. *See Right to Resist*, 78 Yale L.J. at 1131–32. Several early cases reflect this dilemma. *See, e.g., United States v. Thompson*, 28 F. Cas. 89, 90 (C.C.D.C. 1823) (No. 16,484) (warrant signed in pencil, alleging act outside the signing magistrate's jurisdiction); *United States v. Goure*, 25 F. Cas. 1381 (C.C.D.C. 1834) (No. 15,240) (no warrant).

At common law, if a party resisted arrest by an officer without warrant, and who had no right to arrest him, and if in the course of that resistance the officer was killed, the offence of the party resisting arrest would be reduced from what would have been murder, if the officer had had the right to arrest, to manslaughter. . . .If the officer have no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest. . . .What might be murder in the first case might be nothing more than manslaughter in the other, or the facts might show that no offence had been committed.

*John Bad Elk v. United States*, 177 U.S. 529, 535, 537–38 (1900). The court concluded that there was no authority for a warrantless arrest on a misdemeanor charge. *See id.* at 535. Because the jury was improperly instructed in that regard, the conviction was reversed and the case remanded.

¶ 20. Midway through the 20th century, the Supreme Court reaffirmed that "[o]ne has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases." *United States v. Di Re*, 332 U.S. 581, 594 (1948).[11]

---

[11] Responding to the prosecution's attempt to prove probable cause for a warrantless arrest by virtue of the arrestee's lack of protest, the *Di Re* Court held that ". . . Probable cause cannot be found from submissiveness, and the presumption of innocence is not lost or impaired by neglect to argue with a policeman." *United States v. Di Re*, 332 U.S. 581, 594–95 (1948).

## IV.   WISCONSIN LAW AND THE PRIVILEGE TO FORCIBLY RESIST AN UNLAWFUL ARREST

■

¶ 21.   We first consider whether, with the adoption of the state constitution, Wisconsin recognized a privilege to forcibly resist an unlawful arrest. As noted above, article XIV, section 13 of the Wisconsin Constitution preserves the English common law as it existed at the time of the American Revolution until modified or abrogated. We agree with Ms. Hobson that the common law privilege to forcibly resist unlawful arrest is no exception to this constitutional mandate. We conclude that Wisconsin has recognized this privilege since achieving statehood.

¶ 22.   Next we consider whether the legislature has modified or abrogated this privilege. Ms. Hobson makes a limited statutory argument on which to ground this privilege. She first cites Wis. Stat. § 939.48, the current version of the statute recognizing the privilege of self-defense and defense of others.[12] At

---

[12] **Wis. Stat. § 939.48 Self-defense and defense of others. (1)** A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

. . .

(4) A person is privileged to defend a third person from real or apparent unlawful interference by another under the same conditions and by the same means as those under and by which the person is privileged to defend himself or herself from real or apparent unlawful interference, provided that the person reasonably

oral argument, Ms. Hobson's counsel argued that the privilege to resist an unlawful arrest is a "subspecies" of the statutory privilege of self-defense. She argued that Wis. Stat. § 939.10[13] also protects the common law privilege to forcibly resist an unlawful arrest, and based on Wis. Stat. § 939.45(6),[14] Ms. Hobson's privileged conduct is a defense to any prosecution based on her conduct. We disagree that the legislature, by expressly codifying several defenses, has also codified the privilege to forcibly resist an unlawful arrest in the absence of unreasonable force.

¶ 23.   Indeed, our early statutes did not codify the common law right to resist an unlawful deprivation of liberty in the absence of unreasonable force. In statutes enacted shortly after Wisconsin achieved statehood, the legislature recognized that a homicide would be justifiable, excusable, or manslaughter, if committed in self-defense as resistance to actual or perceived attempted murder, great personal injury or the commission of a felony against that person.[15] Cases interpreting the early statutory self-defense privilege

believes that the facts are such that the third person would be privileged to act in self-defense and that the person's intervention is necessary for the protection of the third person.

[13] **Wis. Stat. § 939.10 Common-law crimes abolished; common-law rules preserved.** Common-law crimes are abolished. The common-law rules of criminal law not in conflict with chs. 939 to 951 are preserved.

[14] **Wis. Stat. § 939.45 Privilege.** The fact that an actor's conduct is privileged, although otherwise criminal, is a defense to prosecution for any crime based on that conduct. The defense of privilege can be claimed under any of the following circumstances:

**(6)** When for any other reason the actor's conduct is privileged by the statutory or common law of this state.

[15] **Chapter 133, Rev. Stats**. (1849) provided:

distinguish that privilege from one justifying the right to resist an unlawful arrest. *See, e.g., Anderson v. State*, 133 Wis. 601, 615, 114 N.W. 112 (1907) (construing sec. 4366, Rev. Stat. (1898) and concluding that it was not prejudicial error to charge that an ordinary arrest without violence, although a restraint of liberty, is not the great personal injury contemplated by the statute in the resisting of which one may be justified in committing homicide, whether the attempted arrest was legal or not); *see also Imperio v. State*, 153 Wis. 455, 459, 141 N.W. 241 (1913)(without directly referring to statute, court concluded that an officer's conduct, although not technically correct in arresting without a warrant, did not justify or excuse homicide by defendants in their attempt to escape, when the defendants knew the officer's official capacity).

¶ 24.   Nor has the current version of the self-defense statute codified the common law privilege to forcibly resist an unlawful arrest. None of the published opinions applying the current self-defense statute includes an unlawful arrest, without unreasonable force, within the statutory term "unlawful

---

**Sec. 5.** Such homicide is also justifiable, when committed by any person, in either of the following cases:

1.   When resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling house, in which such person shall be; or,

2.   When committed in the lawful defence of such person, or of his or her husband, wife, parent, child, master, mistress, or servant, when there shall be a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be imminent damage of such design being accomplished: or. . . .

interference with his or her person."[16] Instead, those cases uniformly concern the actual or perceived threat of physical harm as the "unlawful interference" with the person asserting the privilege. For example, in *Maichle v. Jonovic*, 69 Wis. 2d 622, 627, 230 N.W.2d 789 (1975), this court confirmed that "it is crucial to the defense (of self-defense) that the actor had a reasonable belief that his life was in danger or that he was likely to suffer bodily harm." In another opinion, this court recognized that "the privilege of self-defense rests upon the need to allow a person to protect himself or herself or another from real or perceived harm when there is no time to resort to the law for protection." *State v. Brown*, 107 Wis. 2d 44, 318 N.W.2d 370 (1982). In that case, the defendant violated the traffic speed limit stat-

[16] Other cases applying Wis. Stat. § 939.48(1) all concern an unlawful interference with the person that was allegedly forceful. *See, e.g., State v. Camacho*, 176 Wis. 2d 860, 501 N.W.2d 380 (1993)(defendant claimed deputy grabbed his hair and pointed gun in defendant's face); *State v. Daniels*, 160 Wis. 2d 85, 465 N.W.2d 633 (1991) (defendant, victim and two others in an altercation, victim allegedly threatened defendant who shot him with victim's own gun); *State v. Jones*, 147 Wis. 2d 806, 434 N.W.2d 380 (1989) (victim hit and threatened several family members, pushed defendant down steps, then came toward defendant and took a swing while defendant held a knife); *State v. Gomaz*, 141 Wis. 2d 302, 414 N.W.2d 626 (1987) (victim had beaten defendant the day before the stabbing; victim then approached her with hands stretched toward her neck); *State v. Giwosky*, 109 Wis. 2d 446, 326 N.W.2d 232 (1982) (argument, followed by physical struggle between the victim and the defendant, and the approach of the victim's friend); *Walker v. State*, 99 Wis. 2d 687, 299 N.W.2d 861 (1981) (victim pulled a gun on defendant); *Werner v. State*, 66 Wis. 2d 736, 226 N.W.2d 402 (1975) (victim pushed defendant; defendant fell; altercation ensued).

ute because of what he perceived to be threatening driving by the operator of another vehicle, which turned out to be an unmarked police car. The *Brown* court held that if the law enforcement officer's conduct caused the actor reasonably to believe that violating the law was the only means of preventing bodily harm to the actor or another, the actor could claim the defense of legal justification.[17]

¶ 25.   Finally, we consider whether the privilege to resist an unlawful arrest has been modified or abrogated by our own common or judge-made law. One month after the United States Supreme Court decided *Di Re*, the privilege to resist unlawful arrest was first mentioned by the Wisconsin courts in *State v. Gibbs*, 252 Wis. 227, 31 N.W.2d 143 (1948). The *Gibbs* court referred to the privilege in passing, while directly addressing the question of whether an officer, without a warrant, has cause to arrest a person merely because that individual refuses to consent to a search of his person. As part of that discussion, the court favorably cited *Di Re* for the "undoubted right to resist an unlaw-

---

[17] The chief justice's concurrence contends that our reasoning is inconsistent because this opinion does not abrogate a person's common law right to use force when resisting an arrest in which a law enforcement officer uses unreasonable force. *See* Abrahamson concurring op. at 388. However, we discussed in the preceding pages Ms. Hobson's argument that the right she asserts is a "subspecies of the *statutory* privilege of self-defense." (Emphasis added.) We ultimately conclude that the legislature codified a right to self-defense distinguishable from the right to resist an unlawful arrest. The chief justice's concurrence asserts that our holding should encompass those situations in which the arresting officer uses unreasonable force. *See* Abrahamson concurring op. at 388. Neither of the parties have asked this court to invalidate the statutory right to self-defense. We see no need to consider that question.

ful arrest." *Gibbs*, 252 Wis. at 234. The primary issue confronting the *Gibbs* court was the reverse of that posed to the *Di Re* court. Neither case answers the question of whether Wisconsin common law has modified or abrogated the privilege to resist an unlawful arrest.

¶ 26. The privilege to forcibly resist unlawful arrest in the absence of unreasonable force was again mentioned, but not modified or abrogated, in *State v. Reinwand*, 147 Wis. 2d 192, 433 N.W.2d 27 (Ct. App. 1988). There, the court's discussion recognized an ongoing contraction in the common law privilege to resist an unlawful arrest:

> [s]ince *Mendoza* [*State v. Mendoza*, 80 Wis. 2d 122, 258 N.W.2d 260 (1977), where the defendant claimed self-defense in resisting a police officer's alleged use of excessive force], there has been a trend toward limiting the common law right to resist an unlawful arrest. By 1984, seventeen states had done so by statute or supreme court decision, and several federal appellate courts generally deny such a right [citation omitted]. But whatever may be the status of the privilege in Wisconsin today, we need not decide that issue, for the evidence in this case was insufficient to justify submitting any instruction on self-defense.

*Id.* at 199–200.

¶ 27. *Reinwand* implicitly addressed the statutory right of self-defense, as described above. *Id.* at 200. *Reinwand* relied on *Mendoza*, which analyzed Wis. Stat. § 939.48. As recognized in *Reinwand,* self-defense codified in § 939.48, is separate from the common law right to forcibly resist an unlawful arrest. A citation by the *Reinwand* court to a New Jersey supreme court decision suggests that the common law privilege to

resist an unlawful arrest had already been abrogated.[18] But that citation, without more, is not controlling.

¶ 28. While Wisconsin courts have mentioned the right to forcibly resist an unlawful arrest, they have not had the opportunity to apply it to circumstances as presented by the case at bar. The State argues that because no state case law directly adopts this privilege, the common law right to violent self-help has not existed in Wisconsin. We disagree, and conclude that the common law privilege has existed in Wisconsin, by virtue of article XIV, § 13 of the Wisconsin Constitution, until today.

¶ 29. Nothing in our statutes or case law demonstrates that this common law privilege has been, until now, modified or abrogated. We agree with the State that this court may adopt or refuse to adopt such a privilege. *See State v. Esser*, 16 Wis. 2d 567, 581, 115 N.W.2d 505 (1962). However, our judicial recognition of such a privilege only makes explicit what our state constitution has already generally incorporated.

---

[18] The court in *State v. Reinwand*, 147 Wis. 2d 192, 201, 433 N.W.2d 27 (Ct. App. 1988), included the following quotation in its opinion:

> "Despite his [or her] duty to submit quietly without physical resistance to an arrest made by an officer acting in the course of his [or her] duty, even though the arrest is illegal, his [or her] right to freedom from unreasonable seizure and confinement can be protected, restored and vindicated through legal processes. . . Simply stated, the law recognizes that liberty can be restored through legal processes but life or limb cannot be repaired in a courtroom. And so it holds that the reason for outlawing resistance to an unlawful arrest and requiring disputes over its legality to be resolved in the courts has no controlling application on the right to resist an officer's excessive force. *State v. Mulvihill*, 270 A.2d 277, 280 (N.J. 1970).

## IV. PUBLIC POLICY CONSIDERATIONS

¶ 30.  Against this historical backdrop, we turn to the second question confronting us. Is public policy best served by continuing to recognize the common law privilege to use physical force to resist an unlawful arrest, or by abrogating it? "It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." *Dippel v. Sciano*, 37 Wis. 2d 443, 457, 155 N.W.2d 55 (1967), quoting *Funk v. United States*, 290 U.S. 371, 383 (1933). The State's brief quoted an earlier statement by this court, the common law is judge-made law, designed to accomplish the effectuation of recognized social policies within the framework of legal history. When a rule of law thwarts social policy rather than promotes it, it is the obligation of a common-law court to undo or modify a rule that it has previously made. *Deetz*, 66 Wis. 2d at 15–16.

¶ 31.  Ms. Hobson urges that any change in the privilege to forcibly resist an unlawful arrest be left to the legislature. However, in other cases we have deemed it our responsibility to change a common law rule when we concluded that the change was necessary in the interest of justice. This was true even though the legislature had failed to make the change. *See, e.g., Holytz v. Milwaukee*, 17 Wis. 2d 26, 29, 115 N.W.2d 618 (1962) (abrogating the principle of governmental immunity from tort claims); *Hansen v. A.H. Robins, Inc.*, 113 Wis. 2d 550, 335 N.W.2d 578 (1983) (adopting discovery rule for all tort actions other than those already governed by a legislatively created discovery rule). As with the governmental immunity doctrine addressed in *Holytz*, we are satisfied that the privilege to forcibly resist an unlawful arrest has judicial ori-

gins. *See Holytz*, 17 Wis. at 37. The legal and societal developments since that right was first enunciated provide "compelling reasons" for us to conclude that it is now appropriate for this court to abolish that right, despite apparent legislative inaction. *See State v. Michels Pipeline Construction, Inc.*, 63 Wis. 2d 278, 296, 219 N.W.2d 308 (1974) (instructing that where common law rules govern intentional conduct, changes should only be made for compelling reasons).

¶ 32.   Many other states have faced the question of whether to abrogate the right to forcibly resist an unlawful arrest, with varying results. The overall trend has been toward abrogation of the right.[19] Treat-

---

[19] Eleven states have judicially abrogated the common law right to use physical force to resist an arrest which is unlawful but which does not utilize unreasonable force. *See Miller v. State*, 462 P.2d 421, 427 (Alaska 1969); *State v. Hatton*, 568 P.2d 1040, 1046 (Ariz. 1977); *State v. Richardson*, 511 P.2d 263, 268 (Idaho 1973); *State v. Thomas*, 262 N.W.2d 607, 610–11 (Iowa 1978); *State v. Austin*, 381 A.2d 652, 655 (Me. 1978); *In re Welfare of Burns*, 284 N.W.2d 359, 360 (Minn. 1979); *State v. Nunes*, 546 S.W.2d 759, 762 (Mo. Ct. App. 1977); *State v. Koonce*, 214 A.2d 428, 436 (N.J. Super. Ct. App. Div. 1965); *State v. Doe*, 583 P.2d 473, aff'd in part, rev'd in part, 583 P.2d 464, 467 (N.M. 1978); *State v. Peters*, 450 A.2d 332, 335 (Vt. 1982); *State v. Valentine*, 935 P.2d 1294, 1304 (Wash. 1997).

Seventeen other states have signaled their agreement by legislatively abrogating the common law defense. *See* Ala. Code § 13A–3–28 (1994); Ark. Code Ann. § 5–2–612 (Michie 1993); Cal. Penal Code § 834a (West 1985); Colo. Rev. Stat. § 18–8–103 (2) (1990); Conn. Gen. Stat. § 53a–23 (1985); Del. Code Ann. tit. 11 § 464(d) (1995); Fla. Stat. Ann. § 776.051(1) (West 1992); Ill. Ann. Stat. ch. 720, para. 5/7–7 (Smith-Hurd 1993); Mont. Code Ann. 45–3–108 (1995); Neb. Rev. Stat. § 28–1409(2) (1995); N.H. Rev. Stat. Ann. § 594:5 (1986); N.Y. Penal Law § 35.27 (McKinney 1987); Or. Rev. Stat. § 161.260 (1990); 18 Pa. Cons.

ment of this issue by the American Law Institute represented a turning point in the evolution of this right. After significant debate, the A.L.I. in 1958 promulgated a version of the Model Penal Code abrogating the right, and declaring "[t]he use of force is not justifiable. . .to resist an arrest which the actor knows is being made by a peace officer, although the arrest is unlawful." Model Penal Code § 3.04(2)(a)(i) (Tentative Draft No. 9, 1958). The A.L.I. comment in support of this section asserts that it "should be possible to provide adequate remedies against illegal arrest, without permitting the arrested person to resort to force—a course of action highly likely to result in greater injury even to himself than the detention (citation omitted)." Model Penal Code § 3.04(2)(a)(i) at 19 (Tentative Draft No. 8, 1958). Judge Learned Hand succinctly characterized the risk of continuing the right:

> [t]he idea that you may resist peaceful arrest. . .because you are in debate about whether it is lawful or not, instead of going to the authorities which can determine [lawfulness],. . .[is] not a blow for liberty but on the contrary, a blow for attempted anarchy.

1958 Proceedings, American Law Institute, at 254, quoted in *Rodgers*, 373 A.2d at 950–51.

¶ 33.   Courts and legislatures have terminated the right to forcibly resist unlawful arrest because legal and societal circumstances have changed dramatically since the inception of that right. In the early development of the common law, physical resistance used to be an effective response to the problem of unlawful arrest.

Stat. Ann. § 505(b)(1)(i) (1983); R.I. Gen. Laws § 12–7–10 (1994); S.D. Codified Laws Ann. § 22–11–5 (1988); Tex. Penal Code Ann. § 9.31(b)(2), § 38.03 (West 1994).

There were few if any means of effective redress for unlawful arrest. None of these reasons remains valid today.[20]

> [Our law regarding arrests] not only antedates the modern police department, but was developed largely during a period when most arrests were made by private citizens, when bail for felonies was usually unattainable, and when years might pass before the royal judges arrived for a jail delivery. Further, conditions in the English jails were then such that a prisoner had an excellent chance of dying of disease before trial. [citation omitted]. Today, with few exceptions, arrests are made by police officers, not civilians. . . .When a citizen is arrested, his probable fate is neither bail nor jail, but release after a short detention in a police station.

Sam B. Warner, *The Uniform Arrest Act*, 28 Va. L. Rev. 315 (1942).

¶ 34. The common law right to forcibly resist unlawful arrest developed out of necessity in response to those circumstances. "The rule developed when long imprisonment, often without the opportunity of bail, 'goal (sic) fever', physical torture, and other great dangers were to be apprehended from arrest, whether legal or illegal." *Uniform Arrest Act*, 28 Va. L. Rev. at 330. With those dire possibilities, and no viable judicial or administrative redress, forcibly resisting an unlawful arrest was the only effective option a citizen had. But circumstances have changed. Unhealthy conditions in

---

[20] It appears from the record that Ms. Hobson has filed a civil suit against the Beloit Police Department and the officers involved in this incident.

jails have decreased, while the physical risks of resisting arrest have increased.

> When the law of arrest developed, resistance to an arrest by a peace officer did not involve the serious dangers it does today. Constables and watchmen were armed only with staves and swords, and the person to be apprehended might successfully hold them off with his own weapon and thus escape. Today, every peace officer is armed with a pistol and has orders not to desist from making an arrest though there is forceful resistance.

*Id.* A California court described the change in circumstances more explicitly:

> In a day when police are armed with lethal and chemical weapons, and possess scientific communication and detection devices readily available for use, it has become highly unlikely that a suspect, using reasonable force, can escape from or effectively deter an arrest, whether lawful or unlawful. His accomplishment is generally limited to temporary evasion, merely rendering the officer's task more difficult or prolonged. Thus self-help as a practical remedy is anachronistic, whatever may have been it original justification or efficacy in an era when the common law doctrine permitting resistance evolved.

*People v. Curtis*, 450 P.2d 33, 36 (Cal. 1969).

¶ 35.   Not only is forcible resistance now a substantially less effective response to unlawful arrest, there are many safeguards and opportunities for redress. No longer must individuals languish for years in disease-ridden jails. Now, bail is available. *See generally* Chapter 969, Wis. Stats. No longer are individuals detained indefinitely on dubious charges.

Now, prompt arraignment and determination of probable cause are mandated. *See Gerstein v. Pugh,* 420 U.S. 103, 124–25 (1975); *County of Riverside v. McLaughlin,* 500 U.S. 44, 56–57 (1991) (existence of probable cause must be reviewed within 48 hours). No longer are individuals left to fend for themselves in the legal system. Now, there is a right to counsel. *See Coleman v. Alabama,* 399 U.S. 1, 7 (1970). No longer must individuals violently resist to prevent the fruits of an unlawful arrest from being used to prosecute them. Now, the exclusionary rule is in operation. *See Brown v. Illinois,* 422 U.S. 590, 604 (1975); *State v. Smith,* 131 Wis. 2d 220, 240, 388 N.W.2d 601 (1986). No longer must unlawful police action go undetected or undeterred. Now there are internal review and disciplinary procedures in police departments. No longer must patterns of police misconduct go unchecked. Now, civil remedies and injunctions are available. *See* 42 U.S.C. § 1983.[21]

¶ 36.   The State Public Defender, in its amicus curiae brief, disputes the adequacy or efficacy of the safeguards described above. Some of the Public Defender's arguments, however, are broad generalizations that illustrate why a bright line prohibition of citizen resistance to an unlawful arrest is preferable. For example, the Public Defender characterizes Ms. Hobson's resistance as a "measured response." That characterization may be apt in this case. However, per-

---

[21] 42 U.S.C. § 1983 (1988) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the district of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

petuating the privilege to resist an unlawful arrest offers no guarantee that other resisting citizens will act in a measured fashion. The Public Defender acknowledges that a citizen may not resist with force "disproportionate to the effort made to take the individual into custody." *John Bad Elk*, 177 U.S. at 535. But in arrest situations that are often ripe for rapid escalation, one's "measured" response may fast become excessive. Our ruling today, abrogating the privilege, is a step toward deescalation.[22]

¶ 37. Ms. Hobson disputes that the common law rule was founded because of "particular hazards of a primitive local jail," and instead suggests that the privilege emerged from a respect for personal liberty, and the idea that unlawful interference with such liberty was a provocation justifying reasonable resistance. *See* Respondent's brief at 11. For support, Ms. Hobson cites

---

[22] At oral argument, Ms. Hobson's counsel also urged that we keep the privilege as modified by the circuit court. The circuit court concluded that the blanket common law privilege to forcibly resist an unlawful arrest should be modified "so as to not permit resistance to an unlawful arrest unless the health or safety of the individual or a member of his or her family is threatened in a way that is not susceptible of cure later in a court room." Ms. Hobson's counsel contended that adoption of the rule as modified by the circuit court would involve application of an "objectively reasonable standard." Specifically, the fact-finder would have to determine whether the arrestee was reasonable in judging, at the moment of attempted arrest, that the threat to health or safety was not susceptible to a later legal cure. That standard, as articulated by Ms. Hobson's counsel, would also apply in assessing whether the arrestee used "reasonable force" to resist what he or she perceived to be an unlawful arrest. We decline to maintain a modified privilege, because even in modified form the privilege runs counter to the public policy concerns identified herein.

both Professor Chevigny's article, and the dissenting opinion in *Valentine*, 935 P.2d 1294. In particular, Ms. Hobson quotes from the Chevigny article: "The freedom to refuse to obey a patently unlawful arrest is essential to the integrity of a government which purports to be one of laws, and not of men. Unless it is desirable to kill the impulse to resist arbitrary authority, the rule that such an arrest is a provocation to resist must remain fundamental." Respondent's brief at 12, quoting *Right to Resist*, 78 Yale L.J. at 1147.

¶ 38.   This position is reminiscent of the position advocated, unsuccessfully, by petitioners in *Walker v. City of Birmingham*, 388 U.S. 307 (1967). There, individuals asserted that they were free to disobey an injunction against participating in a mass street parade without a permit, because the ordinance on which the injunction was based had been administered in an arbitrary fashion. *See* 388 U.S. at 317. The petitioners failed to challenge the ordinance in court prior to disobeying it by publicly marching. Violence ensued during one of the marches. The petitioners were found in contempt. The United States Supreme Court declined to hold that an injunction issued by a court with jurisdiction over the defendants was constitutionally impermissible:

> The rule of law that Alabama followed in this case reflects a belief that in the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion. This Court cannot hold that the petitioners were constitutionally free to ignore all the procedures of the law and carry their battle to the streets. One may sympathize with the petitioners' impatient commitment to their cause. But respect

378

for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.

*Id.* at 320–21. Accordingly, an injunction arising under an arguably unlawful ordinance was not sufficient "provocation" to permit disregard of the injunction.

¶ 39. In sum, the majority of jurisdictions has concluded that violent self-help is antisocial and unacceptably dangerous. We agree that there should be no right to forcibly resist an unlawful arrest in the absence of unreasonable force. When persons resist arrest, they endanger themselves, the arresting officers, and bystanders. Although we are sympathetic to the temporary deprivation of liberty the individual may suffer, the law permits only a civilized form of recourse. We disagree with the statement of amicus WACDL that our holding "will have imposed a rule that forbids the individual to resist the sovereign's own wrongs." WACDL brief at 12. Justice can and must be had in the courts, not in the streets. We adopt the conclusion reached by the Supreme Court of Alaska:

> The control of man's destructive and aggressive impulses is one of the great unsolved problems of our society. Our rules of law should discourage the unnecessary use of physical force between man and man. Any rule which promotes rather than inhibits violence should be re-examined. Along with increased sensitivity to the rights of the criminally accused there should be a corresponding awareness of our need to develop rules which facilitate decent and peaceful behavior by all.

> . . .

To us the question is whether any amount of force should be permitted to be used by one unlawfully but peaceably arrested. We feel that the legality of a peaceful arrest should be determined by courts of law and not through a trial by battle in the streets. It is not too much to ask that one believing himself unlawfully arrested should submit to the office and thereafter seek his legal remedies in court. Such a rule helps to relieve the threat of physical harm to officers who in good faith but mistakenly perform an arrest, as well as to minimize harm to innocent bystanders. The old common law rule has little utility to recommend it under our conditions of life today. We hold that a private citizen may not use force to resist peaceful arrest by one he knows or has good reason to believe is an authorized peace officer performing his duties, regardless of whether the arrest is illegal in the circumstances of the occasion.

*Miller v. State*, 462 P.2d 421, 426–27 (Alaska 1969) (footnote omitted). Accordingly, we hold that Wisconsin has recognized a privilege to forcibly resist an unlawful arrest, but based on public policy concerns, we hereby abrogate that privilege.[23]

## V.   PROSPECTIVE APPLICATION OF ABROGATION

¶ 40.   Because we decide to abrogate the common law defense of resisting an unlawful arrest in the

---

[23] Our conclusion to abrogate the privilege in no way means that "police are above the law" as amicus State Public Defender predicts. Our conclusion is instead an affirmation of the protections the law presently affords to persons unlawfully arrested. Ms. Hobson has apparently invoked some of those protections by filing a claim against the Beloit Police Department under § 1983.

absence of unreasonable force, we next must determine how this abrogation affects Ms. Hobson's invocation of the defense.[24] We conclude that the effect of our abrogation of the affirmative defense is prospective only.

¶ 41.  The Ex Post Facto clauses of both the United States and Wisconsin Constitutions prohibit the state from enacting any law which imposes punishment for acts not punishable at the time they were committed. *See* U.S. Const. art. I, § 10; Wis. Const. art. I, § 12.[25] This principle of due process applies also to law arising from judicial decisions. *See State v. Kurzawa*, 180 Wis. 2d 502, 510–11, 509 N.W.2d 712 (1994). The ex post facto prohibition applies as well when a new rule of law deprives a defendant of a previously available defense. *See Beazell v. Ohio*, 269 U.S. 167, 170 (1925); *State v. Thiel*, 188 Wis. 2d 695, 703, 524 N.W.2d 641 (1994).

¶ 42.  In addition to urging us to abrogate the common law defense of forcibly resisting an unlawful arrest in the absence of unreasonable force, the State asks that we reverse the circuit court's order dis-

---

[24] The defendant has the burden of raising an affirmative defense, at least where evidence of the exempting fact is especially within the knowledge or control of the defendant. *See Blenski v. State*, 73 Wis. 2d 685, 697, 245 N.W.2d 906 (1976).

[25] Art. I of the United States Constitution provides:

Section 10. No State shall. . .pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

Art. I of the Wisconsin Constitution provides:

**Attainder; ex post facto; contracts.** Section 12. No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed, and no conviction shall work corruption of blood or forfeiture of estate.

missing the battery charge against Ms. Hobson and remand for further proceedings. We decline to do so. In this case, the acts which constitute Ms. Hobson's lawful resistance to her unlawful arrest for obstructing, disorderly conduct and resisting are the same acts which the State alleges constitute the basis for the charge of battery to a peace officer. Contrary to the State's position, Ms. Hobson's privilege, though hereafter closed to others, compels us to reverse the order dismissing the battery charge.

## VI. HOBSON'S ALTERNATIVE ARGUMENTS

¶ 43.   Because we affirm the circuit court's order dismissing the charges against Ms. Hobson, we need not address the alternative arguments she raises of outrageous governmental conduct, and a right to suppression of the evidence.

*By the Court.*—The order of the circuit court is affirmed.

¶ 44.   SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*concurring*). I concur in the mandate.

¶ 45.   The majority opinion overturns a rule of law dating to the 1600s in England and to the 1848 adoption of the Wisconsin constitution. Neither the facts of this case nor public policy provides adequate cause to overturn this long-standing body of precedent.

¶ 4.   The majority opinion holds that when an officer makes an unlawful, but nonviolent, arrest the person arrested does not have the right to resist. Thus, a person who resists an unlawful arrest, even without force, can be prosecuted for battery to an officer (Class D felony), disorderly conduct (Class B misdemeanor), resisting or obstructing an officer (Class A misde-

meanor), the charges brought against Ms. Hobson in this case. The majority opinion, although allowing Ms. Hobson's criminal charges to be dismissed, would subject another parent in Ms. Hobson's situation to criminal prosecution and a possible criminal record.

¶ 47.   This case presents a classic situation for the right to resist unlawful arrest. It illustrates why the common law right protecting victims of unlawful arrest was developed and why it should be retained. I discuss in turn: (1) the facts in this case; (2) the majority opinion's misconstruction of the rationale underlying the common law right to resist an unlawful arrest; (3) the majority opinion's internal inconsistency in its stated concerns about escalation of violence; and (4) the majority opinion's misplaced reliance on various legal remedies to redress the wrong of unlawful arrest. For the reasons set forth I write separately.

I

¶ 48.   In this case a law enforcement officer attempted to question a 5-year-old boy at his home about another child's bike, which reportedly had been stolen. A youth had reported seeing the 5-year-old riding the bike. The mother of the 5-year-old refused to allow the officer to speak to the child. No one asserts that the mother was required to allow the 5-year-old child to be questioned by the officer. Indeed, the circuit court found that the mother's refusal to allow the child to be questioned by the officer was neither disorderly conduct nor obstruction of the officer.

¶ 49.   Following the mother's refusal to allow the officer to question her 5-year-old son, the officer said that he would take the boy to the police station for questioning. When the mother refused this request, the

officer called for backup and attempted to take the mother into custody.

¶ 50.    The circuit court correctly found that "the officer had no authority to take a citizen who refuses to be interviewed to the police station to compel an interview there, especially a five-year-old boy." Wisconsin statutes provide that if an officer has probable cause to believe that a child under the age of 12 has committed an offense, the officer must immediately make every reasonable effort to release the child to a parent. *See* Wis. Stat. § 48.20(2). In this case the parent was present when the officer approached the child; yet the officer sought to remove the child from the parent's charge.

¶ 51.    The officer then decided to arrest the mother. The circuit court correctly concluded that there was no lawful basis for the mother's arrest. No one disputes this conclusion.

¶ 52.    In a careful and scholarly examination of the same legal authorities relied upon by the majority opinion, the circuit court concluded that the mother's right to resist the unlawful arrest should be protected. The circuit court made plain that it was deeply offended by the officer's conduct in this incident. In the hearing on the motion to dismiss, the circuit court expressed its dismay:

> You and I both know that they don't take five-year-olds into custody because they think they stole a bicycle. Now, that's not the standard in this or any other community that I know of. They took this kid down there because they were hacked off because she wouldn't let them interview the child at her home. . . . When have you ever heard of them arresting a five-year-old and taking them into custody because they believe that a bicycle had been sto-

384

len?. . .[Y]ou and I know that it isn't done. A report is filled out. It goes to the probation people and they decide whether to file a petition. That's what happens.

Further, the circuit court wrote, "Nothing would permit the officer to take a five-year-old child to a police station for a junior version of the 'third degree.' "

¶ 53.   If the circuit court was so angered by this incident months after it occurred, imagine how the mother felt when the officers threatened to interrogate her 5-year-old son and to take him to the police station. Her distress and anger were understandably reflected by her actions.

¶ 54.   The record is silent as to whether anyone witnessed the events at Ms. Hobson's home. It is unfortunate that no one intervened and persuaded her to comply with the officer's demands. Had the mother complied with the officer's demands, it might have been better in the short and long run for the mother, the child, law enforcement and the community. Nevertheless, the existence of rights, "such as the right to remain silent or to be free from unlawful searches, does not depend upon whether it is prudent for the individual to assert them." Paul G. Chevigny, *The Right to Resist Arrest*, 78 Yale L.J. 1128, 1137 (1969).

## II

¶ 55.   The majority's decision to abrogate the common law right to resist unlawful arrest rests on an important public policy consideration, one with which I wholeheartedly agree: all of us must promote peaceful settlement of disputes, not violence on the streets. Calling its ruling "a step toward deescalation," majority op. at 377, the majority opinion reasons that force begets force, violence begets violence. In other words, when an

unlawfully arrested person responds with measured resistance, that resistance increases the likelihood that the arresting officer will respond with greater force to subdue the person.

¶ 56. In choosing to abrogate the common law right to resist an unlawful arrest for reasons of public policy, the majority ignores the rationale behind the right. The common law right to resist an unlawful arrest was not designed to foster resistance to law enforcement officers or to encourage people to disobey them. Instead the common law right to resist unlawful arrest was designed to protect a person provoked by a wrongful arrest from being criminally charged with obstructing an officer. Professor Chevigny, a commentator upon whom the majority relies, explains that it is fundamentally unfair to punish a person who has been unlawfully arrested for expressing his or her deep emotion with measured resistance:

> The right does not exist to encourage citizens to resist, but rather to protect those provoked into resistance by unlawful arrests. In the excitement of an arrest, a person is likely to respond to his emotions, and if his impulse to resist is provoked by arbitrary police behavior, it is fundamentally unfair to punish him for giving in to that impulse with measured resistance.

Paul G. Chevigny, *The Right to Resist Arrest*, 78 Yale L.J. 1128, 1133–34 (1969).

¶ 57. Although I share the majority's concern about avoiding the escalation of violence between law enforcement officers and those who are unlawfully arrested, I conclude that the majority's decision to abrogate the common law privilege is not really a step toward "deescalation." As Professor Chevigny notes, a

person unlawfully arrested may understandably act out of passion; in the heat of the moment a person does not, indeed cannot, carefully consider his or her alternatives. The mother in this case did not contemplate the state of the law before responding to the unlawful arrest of her child; nor would other persons facing her situation in the future.

¶ 58. The real question here is not about escalating violence; it is about whether a person ought to be prosecuted for resistance of the kind in this case. In contrast to Justice Geske's characterization in her concurrence of other possible fact situations, in this case Ms. Hobson did not fight with the police and she was not violent. The circuit court found that Ms. Hobson "clearly used only force sufficient to attempt to prevent her illegal arrest. She flailed her legs and arms about as the police officer had 'taken her to the ground.' She did not chase an officer down the street. There is a complete absence of an intent to assault an officer. Her only evident intent was to prevent her illegal arrest. She did not assault the police officer; the police officer assaulted her."

¶ 59. The common law right to resist unlawful arrest was designed for just the situation presented in this case. A person is unlawfully arrested and is provoked to anger and emotion to resist the unlawful arrest. Under such circumstances, according to the common law, the person wrongfully arrested should not be subject to criminal prosecution.

III

¶ 60. The majority opinion does not abrogate a person's common law right to use force when resisting an arrest in which a law enforcement officer uses

*unreasonable* force. The reasoning of the majority opinion is thus internally inconsistent.

¶ 61. The majority opinion retains the common law rule that a person arrested unlawfully has the right to use reasonable force when the arresting officer uses unreasonable force. This right to use reasonable force is a right of self-defense designed to protect a person's bodily integrity and health based on the rationale that while liberty can be restored through legal process, life and limb cannot be repaired in a courtroom.

¶ 62. If the majority is principally concerned with decreasing the physical risks associated with unlawful arrests, then the holding of the majority opinion should encompass those situations presenting the greatest risk of danger, those situations in which the arresting officer uses unreasonable force. The majority opinion's holding thus does not follow from its stated concern about "deescalation."

## IV

¶ 63. The majority opinion attempts to bolster its holding with the explanation that in modern society it is no longer justifiable to resist unlawful arrest because legal remedies are available for victims of unlawful arrest. By asserting that adequate remedies exist to redress unlawful arrests, the majority opinion misconstrues the rationale underlying the right to resist unlawful arrest, which, as I have explained, is to protect from criminal prosecution a person who is provoked by the police to resist an unlawful arrest.

¶ 64. Furthermore, the remedies at law are not effective in this situation. The majority opinion explains that unlawfully arrested persons should go down to the police station, secure their freedom by

making bail and later bring civil rights actions against the police. In adopting this reasoning, the majority opinion treats the experience of undergoing arrest, fingerprinting, photographing, interrogation, detention and trying to make bail as minor deviations from a person's daily routine.

¶ 65. Unfortunately the legal system does not always work so smoothly. The right to counsel, although constitutionally guaranteed, is unfortunately not available to those not poor enough to qualify for a public defender but too poor to hire their own private counsel.[1] The majority opinion's reliance on civil damages actions is similarly problematic. Although a civil rights action under 42 U.S.C. § 1983 is in theory available for victims of unlawful arrest, in practice such relief is contingent on the availability and willingness of attorneys to bring such actions. Attorneys are hesitant to accept such cases when monetary damages are insignificant or difficult to prove. Likewise internal review and disciplinary procedures in police departments do not provide an adequate remedy for victims of unlawful arrest.

¶ 66. Thus, contrary to the reasoning of the majority opinion, the various procedural safeguards in the criminal justice system often fail to provide adequate redress for victims of unlawful arrest. In evaluating the legal remedies afforded to victims of unlawful arrest, this court should not wear blinders to what happens in real life or discount the indignity of being subjected to unlawful arrest, the potential physi-

---

[1] According to a survey completed by the Office of the Wisconsin State Public Defender, 32 percent of persons seeking representation in 1997 did not meet the Public Defender's indigency criteria.

cal harm of being incarcerated, and the negative consequences to reputation and employment.

¶ 67. There is no legal remedy that can rectify the harm to a young child who is interrogated by the police. In this case Ms. Hobson sought only to protect her 5-year-old son, and as the circuit court recognized, the threatened injury Ms. Hobson sought to avoid could not be remedied by the various procedural safeguards in the criminal justice system. Once her son was taken to the precinct and interrogated, no procedural safeguard, whether the right to bail or counsel, a probable cause hearing, or a civil rights action, would provide a sufficient remedy or cure.

¶ 68. Although the majority opinion correctly notes that the common law right to resist arrest has fallen into disfavor in a number of American states, I join the many judges in the United States[2] and the

---

[2] The right to resist unlawful arrest is recognized in the following cases: *Ex parte Wallace v. City of Dothan*, 497 So. 2d 96, 97 (Ala. 1986) (a person may use reasonable force to resist unlawful arrest); *Smith v. Holeman*, 441 S.E.2d 487, 491 (Ga. Ct. App. 1994) (a person has the right to resist unlawful arrest with all force necessary); *White v. Morris*, 345 So. 2d 461, 465 (La. 1977) (every person has a right use such force as may be necessary under the circumstances to resist unlawful arrest); *In re Albert S.*, 664 A.2d 476, 486 (Md. Ct. Spec. App. 1995) (right exists to resist unlawful, warrantless arrest); *People v. Krum*, 132 N.W.2d 69, 72 (Mich. 1965) (a person may use such reasonable force as is necessary to resist an unlawful arrest); *Murrell v. State*, 655 So. 2d 881, 888 (Miss. 1995) (self-help is limited to those situations where the arrest is unlawful and the officer and person arrested have reason to know that it is, or where the arrest is accompanied by excessive force); *Brown v. Oklahoma City*, 721 P.2d 1346, 1351–52 (Okla. Ct. App. 1986) (recognizes right to resist unlawful arrest); *Foote v. Commonwealth*, 396 S.E.2d 851, 855 (Va. Ct. App. 1990) (a person has the right to

British commonwealth nations[3] who have continued to recognize the common law right to resist unlawful arrest with a measured response.

¶ 69. The circuit court concluded in this case that a superior social policy is advanced by a rule permitting resistance to unlawful arrest when the health or safety of the person being arrested, or of a family member, is threatened in a manner not susceptible of subsequent cure in a courtroom. Under these circumstances the common law rule excusing a person who is provoked to reasonable resistance by unlawful state action should be retained. At a minimum, the majority opinion should adopt the circuit court's position.

¶ 70. As the circuit court wrote, "it is difficult to imagine a mother who would allow her five-year-old son to be dragged off to the station house and subjected to an illegal interrogation. It certainly would be hollow to suggest that she submit to that process and then argue about it in court after whatever harm to the child will have already occurred. The circumstances under which an individual should be allowed to resist an

use reasonable force to resist unlawful arrest; rules of self-defense determine whether the force used is reasonable).

[3] In the oft-cited case *Christie v. Leachinsky* [1947] AC 573, [1947] 1 All ER 567, Lord Simonds said, "it is the corollary of the right of every citizen to be thus free from arrest that he should be entitled to resist that arrest unless that arrest is lawful. . . ."

In recent years England and the Canadian province of Alberta have reaffirmed the common law right to resist unlawful arrest. *See Regina v. Howell*, [1982] QB 416 (in cases of unlawful arrest a person is entitled to use reasonable force to resist the arrest); *Carr v. Gautheir*, [1992] 97 D.L.R. 4th 651, 1992 DLR LEXIS 544, *18, 36 A.C.W.S. 3d 694 (right to resist unlawful arrest is an absolute defense if at the time of the arrest the officer knows he or she has no reasonable and probable grounds and the resistance is not excessive).

unlawful arrest are narrow. This case represents one of those exceptions."

¶ 71.   For the foregoing reasons, I join the court's mandate and write separately.

¶ 72.   WILLIAM A. BABLITCH, J. (*concurring*). The majority opinion completely abrogates the common law right to forcibly resist an unlawful arrest in the absence of unreasonable force. By so doing, the majority refuses to admit any exceptions for the future such as the one the facts so compellingly present here.

¶ 73.   I would admit a very narrow exception to the general rule enunciated by the majority. Like the majority, I would not permit resistance to an unlawful arrest in the absence of unreasonable force; however, I would allow resistance if the individual reasonably believes that serious and substantial mental or physical health concerns of the individual or a member of his or her family are threatened in a way that are not susceptible of cure later in a court room. I would require an objective, reasonableness standard. This holding would be similar to, but not in complete accord with, the holding of the circuit court, reprinted below.[1]

¶ 74.   This holding would not commit us to the rigidity of the majority's rule of law which could lead to future injustice: witness the facts of this case. It would also comport more with common sense and reality than does adherence to the common law that allows resis-

---

[1] "[T]he superior social policy is advanced by a rule which modifies the common law rule so as to not permit resistance to an unlawful arrest unless the health or safety of the individual or a member of his or her family is threatened in a way that is not susceptible of cure later in a court room." Order of Dismissal, at 6.

tance to any unlawful arrest. Finally, it would recognize the reality that courts cannot always provide adequate redress for the harm caused by an unlawful arrest.

¶ 75.  I agree with the circuit court's persuasive statement in dismissing this case:

> In the case now before the court, the defendant was acting to prevent the unlawful arrest of herself, an arrest which would result in the police taking her five-year-old son to the police station for an interrogation. While it probably has no legal relevance, it may be noted that all of this furor occurred because another child said the boy was riding a stolen bicycle. The harm to a typical five-year-old child of being taken to a police station and being grilled under these circumstances can be as devastating as watching a family member being beaten. The harm to the child is not of such a nature that it can be vindicated later in a courtroom. The necessity of protecting the child at that moment from the illegal police activity is paramount.
>
> Any other rule would be futile. What parent would stand by while the police treated a five-year-old child in that way? To adopt a contrary rule would have no effect on the way people conduct their affairs.

Order of Dismissal, at 7.

¶ 76.  Although Ms. Hobson escapes prosecution as a result of the prospectiveness of the majority opinion, an undoubtedly just result, what about any future Ms. Hobsons? Under similar circumstances, it is simply not reasonable to expect a parent to sit back and do nothing. Our common law should reflect that reality.

¶ 77.  I am authorized to state that Justice Ann Walsh Bradley joins in this concurrence.

393

¶ 78.   JANINE P. GESKE, J. (*concurring*).

I write separately to address the concurrence of Chief Justice Abrahamson. Although the majority opinion abrogates a common law defense, I believe that few persons actually assumed that because of early common law, citizens still had the right to physically resist an unlawful, nonviolent arrest. In fact, this is the first time in our state's history that this specific issue has been raised before this court.

¶ 79.   The majority opinion discusses why historically such a right to resist developed. However, over time our system of justice has substantially changed, giving arrestees increased legal protections. Any argument in favor of the protection against prosecution afforded by the right to resist is far outweighed by the substantial harm that can certainly occur. I am convinced that if the chief justice's concurrence's position became the majority opinion, violence toward police officers and others would only escalate after our opinion was issued. A widespread belief that one could legally fight with the police and be immune from prosecution if a judge later concludes that the arresting officers lacked probable cause could certainly increase the violence that police already frequently face.

¶ 80.   Although the facts of this case are troubling, Ms. Hobson has a potential remedy for the unlawful arrest of her child. The chief justice's concurrence criticizes the majority opinion because it advocates "that unlawfully arrested persons should go down to the police station, secure their freedom by making bail and later bring a civil rights action against the police." Chief Justice Abrahamson concurring op. at 388–89. The concurrence contends instead that there is a need to continue to recognize immunity for those arrestees and family members who resist and

fight with the police when an officer is making what turns out later to be an unlawful, but nonviolent arrest. In other words, persons who, from their vantage point, do not believe that an officer is lawfully arresting either themselves or a family member, could start fighting with that officer in order to try to stop the arrest. Protection against criminal prosecution in those instances could lead not only to serious injuries of officers, but could escalate the violence among the participants and observers of the challenged arrest because the officers then would be compelled to use force to stop the attack on themselves.

¶ 81. Many people, subjected to an arrest, will fight with the police. Police, arrestees, and others are often injured in the course of those arrests. If this court would continue to recognize immunity for physical resistance of an arrest by an officer who is not exerting unreasonable force and who mistakenly believed that he or she had probable cause to arrest, we would be encouraging arrestees to violently settle their legal dispute with the officer in the street rather than with the judge in a courtroom. This court ought to discourage citizens from engaging in violence against police officers and tell them to challenge the lawfulness of any arrest in court.

¶ 82. I am authorized to state that Justice Donald W. Steinmetz and Justice Jon P. Wilcox join in this concurrence.