¶ 98
ANNETTE KINGSLAND ZIEGLER, J.
{dissenting). "It's amazing in the circumstances we aren't sitting here over an inquest rather [than] these charges, because in most jurisdictions that I know of with Mr. Stietz pulling a gun on [an] officer, he would have been shot. He is very, very fortunate that [the *612 officer] didn't shoot him." So remarked the circuit court below, in a case that arose after the defendant, Robert Joseph Stietz ("Stietz"): (1) refused to surrender his rifle to two Department of Natural Resources ("DNR") wardens lawfully investigating potential hunting violations; (2) drew a handgun on the wardens after being disarmed of the rifle against his will; and (3) failed to surrender the handgun for over half an hour despite repeated requests for compliance.
¶ 99. Arguments have been made that Stietz is not to blame for the escalation of his interaction with the wardens into an armed standoff. But a jury considered those arguments, and rendered a thoughtful verdict: it concluded that Stietz should not be convicted for offenses pertaining to the initial struggle over the rifle, but that Stietz's subsequent decision to hold two wardens at gunpoint—despite Stietz's own admission that he knew the wardens were law enforcement officers by that time—was a bridge too far. With regard to Stietz's actions toward one of the two wardens, the jury found Stietz guilty of resisting an officer, use of a dangerous weapon, in violation of Wis. Stat. § 946.41(1), with the penalty enhanced by Wis. Stat. § 939.63(l)(a), and guilty of intentionally pointing a firearm at a law enforcement officer, in violation of Wis. Stat. § 941.20(lm)(b). With regard to Stietz's actions toward the other warden, the jury found Stietz not guilty of resisting an officer, use of a dangerous weapon, and not guilty of intentionally pointing a firearm at a law enforcement officer. The jury also found Stietz not guilty of first degree recklessly endangering safety, in violation of Wis. Stat. § 941.30(1), and not guilty of negligent handling of a weapon, in violation of § 941.20(l)(a).
*613 ¶ 100. What is the likely reason for the jury to conclude that Stietz was guilty of some offenses and not guilty of the others? The jury, considering all of the factors that this court relies upon, concluded that Stietz was not endowed with the authority to continue to point a firearm at law enforcement under these circumstances. This conclusion is not only supportable, it is wise. Imagine the unfortunate consequences that might ensue if anytime someone does not believe that law enforcement has the authority to be somewhere or the authority to act, citizens could take the law into their own hands and escalate a situation by pointing a firearm at the officers. Right or wrong in belief, it is not difficult to understand the unfortunate outcomes that would take place.
f 101. Stietz now appeals, arguing principally that the circuit court erred in declining to instruct the jury that Stietz might have been acting in self-defense and that the wardens might have been trespassing.[1] This is not a self-defense case. The circuit court was not incorrect. Moreover, the jury's verdict demonstrates that it found his reaction to law enforcement somewhat excusable with respect to the initial contact. The jury, however, found that the continued exhibition of force was not. In other words, the crimes for which he was convicted do not support a self-defense instruction.
*614 f 102. I dissent because I conclude that the circuit court did not err in declining to instruct the jury on the issues of self-defense and trespass. First, Sti-etz's claim that he was acting in self-defense was "so thoroughly discredited" by the close of evidence "that no reasonable jury could conclude that the state had not disproved it," State v. Head, 2002 WI 99, ¶ 115, 255 Wis. 2d 194, 648 N.W.2d 413; consequently, he was not entitled to the corresponding instruction and the circuit court properly exercised its discretion in declining to so instruct the jury.
¶ 103. Second, even if the circuit court had erred in neglecting to instruct the jury on self-defense, that error was harmless. As will be explained in detail below, in order to have convicted Stietz of resisting an officer, use of a dangerous weapon, and intentionally pointing a firearm at a law enforcement officer, the jury had to have found as elements of those crimes that Stietz knew or had reason to know that Warden Webster was a law enforcement officer. In other words, the jury plainly would have rejected Stietz's claims that he had no idea the wardens were law enforcement officers and was acting in self-defense.
¶ 104. Third, Stietz had no independent legal right to forcibly resist the wardens simply because he thought the wardens lacked legal authority to seize or disarm him. Stietz is badly mistaken in suggesting that the law authorizes citizens to attack law enforcement officers whenever those officers may have made a mistake of fact or law. Law enforcement officers have entered houses, much less open fields, by accident; that does not authorize lethal resistance. If Stietz thought that law enforcement was in error, his recourse was the judicial system, not physical assault. To hold otherwise is not only incorrect as a legal matter; it *615 would also disincentivize law enforcement officers from doing their job. Most relevant to this case, for example, the work of DNR wardens is critical to ensuring the protection of Wisconsin wildlife and the safety of Wisconsin hunters.[2]
¶ 105. Finally, with respect to trespass, the wardens possessed both statutory authority to enter Stietz's property and reasonable suspicion that hunting violations were in progress. The circuit court did not err in declining to instruct the jury regarding the law of trespass.
¶ 106. This case is not about property rights, the right to keep and bear arms, or the right to hunt. In no way should this dissent be read to diminish those very important rights. These rights are cherished by the citizens of Wisconsin in a special way, see, e.g., Wis. Const, art. I, § 26 ("The people have the right to fish, hunt, trap, and take game subject only to reasonable restrictions as prescribed by law."), and this court is of course bound to uphold and protect them. Instead, this case is about an individual, Stietz, who put his own life and the life of two DNR wardens at risk rather than peacefully submit to a lawful request for his weapon.
f 107. This case was fully litigated below, and— not surprisingly given the evidence—the jury found Stietz guilty of resisting an officer, use of a dangerous weapon, and intentionally pointing a firearm at a law enforcement officer. I do not quarrel with the jury's determination to find Stietz not guilty of one of the counts of resisting an officer, use of a dangerous weapon, one of the counts of intentionally pointing a firearm at a law enforcement officer, first degree reck *616 lessly endangering safety, and negligent handling of a weapon. However, when this case goes back for another trial, the entire case will not be retried, rather only the crimes for which Stietz was found guilty. The jury already placed its determination on the entire nucleus of fact and concluded that he was not guilty of resisting an officer, use of a dangerous weapon, with regard to one of the wardens, not guilty of intentionally pointing a firearm at a law enforcement officer with regard to the same warden, not guilty of first degree recklessly endangering safety, and not guilty of the negligent handling of a weapon.
f 108. At the same time, the jury concluded that Stietz was guilty of resisting an officer, use of a dangerous weapon, and intentionally pointing a firearm at a law enforcement officer with regard to the second warden. Regrettably, while this court is required to give deference to the jury determination, it instead upsets that jury determination even though the jury's conclusions are supported by sufficient evidence in the record. See, e.g., State v. Poellinger, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990) ("[I]n reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt."). Because I would affirm the court of appeals (the trial court and the sound conclusions reached by the jury upon the facts and the law), I respectfully dissent.
*617 r-H
¶ 109. I begin by setting forth the facts of this case as established by the testimony of Warden Frost, Warden Webster, and Stietz at Stietz's jury trial. As will be shown, this case hinges in large part on the testimony presented to the jury.[3]
f 110. Warden Joseph Frost ("Warden Frost") testified that on November 25, 2012, at about 4:30 p.m., he and Warden Nicholas Webster ("Warden Webster") were on duty in a patrol truck on a highway near Lamont, Wisconsin. Warden Frost "observed a vehicle north of the highway parked along the fence line"; in his view it was "not typical for vehicles to be parked in the field," though "typically during deer season that's where people would park if they're out hunting." Warden Frost consequently thought the vehicle might belong to someone hunting deer, whereas Warden Webster thought the vehicle might have been abandoned. It was the last day of deer season, and hunting hours ended at 4:45 p.m. The wardens "decided [they would] just check around that section of land by driving the roads to see if [they] could see anybody out hunting." The wardens did not see anything of note, however, and eventually made their way to the vehicle they had spotted.
¶ 111. At about 4:58 p.m., Warden Webster ran the registration of the vehicle while Warden Frost "checked to see if there was any evidence of hunting in the vehicle and to . . . see if it was an abandoned vehicle or not." Warden Frost saw an empty gun case on the front seat, scent killer spray, and a camouflaged *618 seat that could be used on a tree stand. Warden Webster learned that the vehicle was registered to Robert and Susan Stietz.
¶ 112. The wardens "decided that [they] would go in and see if [they] could locate the hunter." The wardens were wearing "blaze orange" jackets and hats. The jackets had identification badges or patches on them, as did the hats. Further, the wardens did not carry long guns; Warden Frost testified that that is "usually a give away as to us not being hunters." The wardens followed the fence line until they came to an open gate and then headed through the gate. Eventually they saw a "box blind up on an elevated box stand" and began heading toward it. Shortly thereafter the wardens came upon Stietz, who was dressed in full camouflage and carrying a "long gun." Stietz "would take a few steps and stop, look around, take a few steps, stop and look around." It was dark and Stietz "didn't seem to acknowledge [the wardens] were there." Warden Frost "turned on [his] flashlight and shined it at [Stietz] and announced, 'conservation warden.' " Warden Webster made the same announcement. The parties continued approaching each other and Warden Frost saw what looked like a handgun in Stietz's pocket. Warden Frost told Warden Webster about the handgun. Warden Webster testified that "red flags were starting to go off, starting to not seem right," because Stietz had "in his face a kind of agitation, aggression" and because Stietz "went from holding his gun off to the side and then turned his gun facing straight on as [Warden Webster] was approaching him."
¶ 113. Warden Webster was the first to make contact, and asked Stietz if he had seen any deer. Stietz responded that he had "seen seven doe." Accord *619 ing to Warden Frost, Warden Webster then asked Stietz "if the rifle he was carrying was loaded," and Stietz affirmed that it was. Warden Frost "asked [Stietz] if [Warden Frost] could see the firearm," and Stietz refused.[4]
¶ 114. Warden Frost "changed the topic" and asked if Stietz had any blaze orange with him. Stietz "indicated towards" his pocket, and Warden Frost "could see just a sliver of a piece of orange clothing in there." Warden Frost testified that "[t]he fact that [Stietz was] carrying orange in his pocket, based on my training and experience, would lead me to believe he was actually out hunting." At some point during the parties' interaction, Stietz explained that he had not been hunting, but was instead looking for trespassers. Warden Frost again asked Stietz if he "could see the firearm." Warden Frost testified that there were two reasons he asked to see the weapon:
One, [Stietz] is dressed in camouflage, it's after hours, he said his firearm is loaded, which I guess gave me reason to believe he was potentially hunting after hours, hunting without blaze orange. And then when he responded he wouldn't allow us to see the firearm. I guess, at that point there is a concern for, I guess, our safety that I guess something could happen if he continues to have the firearm.
Warden Webster additionally explained that "[w]hen [the wardens] are working and enforcing hunting laws, depending on what's being hunted, ammunition type, firearms type, amount of ammunition, are also parts that are regulated in hunting."
*620 f 115. When he made his second request to obtain Stietz's weapon, Warden Frost simultaneously "stepped forward and reached [his] hand towards the firearm." Stietz hit Warden Frost in the stomach with the butt of the rifle. Warden Frost then grabbed the rifle and "drove [his] body forward towards [Stietz]." While Stietz and Warden Frost grappled for control of the weapon, Warden Webster "yelled out that. . . the barrel was pointed at him." Warden Webster grabbed the muzzle of the gun and "pulled it as hard as [he] could in the direction that [Warden] Frost was pulling it," yelling "drop the gun." Warden Frost ultimately "ended up with the firearm in [his] hands, laying on [his] back."
¶ 116. Disarmed of the rifle, Stietz began drawing his handgun. As he was doing so, Warden Webster yelled "don't do it." Warden Webster drew his handgun on Stietz before Stietz had fully drawn his handgun. Warden Frost also drew his handgun, having thrown the rifle "to the side." Stietz "swung [his handgun] by Warden Frost's direction," but then pointed it towards Warden Webster. "[T]he hammer was cocked with his right thumb by the hammer, his trigger finger would have been inside the trigger guard basically on the trigger." The wardens ordered Stietz to lower his weapon, but Stietz refused. Warden Webster "radioed to the Sheriffs Department" at 5:07 p.m. The wardens repeatedly attempted to get Stietz to drop his weapon, but he would not do so. At various times during the standoff Stietz commented, among other things, that he knew his rights, that he was defending himself and his property, and that he would lower his weapon if the wardens lowered their weapons. At other times Stietz would not respond to the wardens at all.
*621 ¶ 117. At 5:17 p.m., Deputy Brett Broge ("Deputy Broge") arrived in his "squad." The wardens retreated to the squad car. At that time Stietz had his handgun pointed "towards the squad." Warden Frost left the parties, returned to Warden Webster's squad, turned on its emergency lights, removed his blaze orange, and obtained a rifle and shotgun from the vehicle. By the time Warden Frost made contact with the parties again, Stietz had lowered his handgun but would not put it down. Other members of law enforcement arrived but Stietz "still basically wouldn't comply." Finally, about "40 to 50 minutes" "from the time.. . [the wardens] were initially there until it was all over," Stietz put his weapon down and was placed in handcuffs.[5]
¶ 118. Stietz testified that on the date in question he had not been hunting but was instead "checking for trespassers," a recurring issue for Stietz.[6] That evening Stietz "encountered two people in orange" on his property and he "didn't know who they were." While Stietz saw the individuals' "faces and their orange clothing," he denied seeing their patches or badges. According to Stietz, one of the individuals asked, "are you Bob Stietz?" Stietz replied "yes, I am. The question is, who are you?" Stietz heard a response that was "kind of mumbled, but sounded like one was saying Green, I didn't know if it was County. And the other one said—looked at him and said a Warden, but it was kind of mumbled, not real loud." Next, Stietz was asked if he was hunting and was told that he had to be in orange if he was hunting deer. Stietz informed the *622 wardens that he was not hunting deer but was instead "checking for trespassers." When asked if he had seen any deer, Stietz replied that he had seen seven of them.
¶ 119. According to Stietz, when Stietz said he was checking for trespassers one of the wardens "got— kind of a little bit riled." Additionally, one of the wardens "threw up his arms like this. You've got to be in orange." According to Stietz, the wardens "c[a]me around [Stietz] in like a circle." At that point Stietz "was wanting to go to [his] car and. .. would have been heading home." "The Wardens proceeded around [Sti-etz] .. . asking [him] questions." One of the wardens said "give me your gun." Stietz said no and took a step back. At that point he "felt like [he] was being attacked" because one of the wardens grabbed his shirt and told the other warden to "grab the gun." Stietz denied swinging the butt of the rifle into Warden Frost's stomach. The three struggled for Stietz's rifle. Stietz "lost [his] grip" and "all of a sudden [Stietz] [saw] the rifle go, and . . . heard it hit the fence." The two wardens "kind of lost their footing." Stietz saw Warden Webster "reaching for his pistol" and "all of a sudden .. . [saw] the pistol coming up." Stietz thought Warden Webster was going to shoot and drew his pistol at the same time. Stietz said, "I have the right to protect myself which I am doing at this time."
¶ 120. At this point in time all three individuals had their handguns drawn. Stietz was asked to put his weapon down several times but refused, repeatedly stating that he would put his handgun down if the wardens put their handguns down. Eventually one of the wardens called for backup. At trial Stietz was asked, "[W]hen did you know for the first time that these were wardens?" Stietz responded, "I really didn't know positive for sure, because it was kind of dark out and when *623 we—when actually, I really don't know because I never seen no credentials or when he called for backup, that's when I knew really." (Emphasis added.) Stietz testified that he was "scared, darn scared." Backup arrived. The following exchange occurred at trial:
Q: You said that you were relieved when the Sheriffs showed up; is that right?
A: That is correct. Relieved.
Q: But you weren't relieved enough to put your gun down at that point, were you?
A: As I stated in my testimony, when the wardens put their guns down, because they draw on me first, I would put mine down.
[[Image here]]
Q: Why didn't you put it down right away once Deputy Broge was on site?
A: As I stated before, the Wardens would not put theirs down, and I wouldn't put mine down until they put theirs down, because they drew on me first.
Stietz eventually lowered his weapon because "when the Sheriffs got there, that's when I felt halfway there'd be witnesses if anything bad happened, there would be witnesses."
¶ 121. Relevant to Stietz's testimony, Warden Webster and Warden Frost denied mentioning Green County in their initial interaction with Stietz. Warden Webster denied grabbing Stietz's shirt. Warden Frost stated that he did not see Warden Webster grab Stietz by the shirt and that Warden Webster had not yelled at him to grab Stietz's rifle. Warden Webster and Warden Frost denied getting "riled" when Stietz told them that he was checking for trespassers, and Warden Frost denied throwing his arms up in the air.
*624 II
¶ 122. On November 28, 2012, a criminal complaint was filed against Stietz in Lafayette County circuit court. On December 11, 2012, an amended complaint was filed charging Stietz with one count of first degree recklessly endangering safety, in violation of Wis. Stat. § 941.30(1), two counts of resisting an officer, use of a dangerous weapon, in violation of Wis. Stat. § 946.41(1), and with the penalty enhanced by Wis. Stat. § 939.63(l)(a), one count of negligent handling of a dangerous weapon, in violation of Wis. Stat. § 941.20(l)(a), and two counts of intentionally pointing a firearm at a law enforcement officer, in violation of § 941.20(lm)(b). On December 18, 2012, an information was filed.
¶ 123. On January 22, 2014, Stietz filed requested jury instructions in anticipation of trial. Stietz requested, among other things, that the jury be instructed regarding: (1) Stietz's putative Second Amendment right to refuse to surrender his rifle to the wardens; (2) the possibility that the wardens were trespassing on Stietz's land; and (3) the possibility that Stietz was acting in self-defense.
f 124. On February 20, 2014, the State filed a motion in limine requesting an order
prohibiting the defendant from arguing any of the following at trial: that the DNR Wardens were armed trespassers; that the DNR Wardens were not authorized to enter his property; that the defendant had a Second Amendment right to resist the Wardens; any arguments by the defendant of self-defense of either person or property.
*625 After a hearing on February 26, 2014, the court entered the following order with respect to the State's motion:
1. The Court will allow evidence (a) that Mr. Stietz was looking for trespassers, (b) that the wardens were armed, (c) of where the wardens walked and what they said and did, and (d) of where and how all relevant events occurred. In short, the facts of what happened are admissible;
2. However, counsel for Mr. Stietz may not characterize the wardens' conduct as trespassing, at least absent a further ruling by the Court; and
3. Further, counsel for Mr. Stietz may not argue that the Second Amendment permitted Mr. Stietz's conduct, or affords a legal defense here.
¶ 125. From March 11, 2014, to March 14, 2014, Stietz was tried before a jury. On March 14, 2014, at the jury instruction conference, it was determined (based in part on prior rulings) that the jury would not receive Stietz's requested instructions regarding the Second Amendment, trespass, and self-defense.
¶ 126. While the charges filed against Stietz and considered by the jury included one count of first degree recklessly endangering safety and one count of negligent handling of a dangerous weapon, Stietz was also charged with one count of resisting an officer, use of a dangerous weapon, with respect to Warden Frost, one count of resisting an officer, use of a dangerous weapon, with respect to Warden Webster, one count of intentionally pointing a firearm at a law enforcement officer with respect to Warden Frost, and one count of intentionally pointing a firearm at a law enforcement officer with respect to Warden Webster.
*626 ¶ 127. Later that day, the jury returned its verdict. The jury found Stietz not guilty of first degree recklessly endangering safety; not guilty of resisting an officer, use of a dangerous weapon with respect to Warden Frost; guilty of resisting an officer, use of a dangerous weapon with respect to Warden Webster; not guilty of negligent handling of a weapon; not guilty of intentionally pointing a firearm at a law enforcement officer with respect to Warden Frost; and guilty of intentionally pointing a firearm at a law enforcement officer with respect to Warden Webster.
¶ 128. On March 24, 2014, Stietz filed a motion for acquittal or a new trial. On May 21, 2014, the court denied the motion. On May 28, 2014, the circuit court sentenced Stietz to one year of initial confinement and three years of extended supervision on the charge of intentionally pointing a firearm at a law enforcement officer. The court withheld sentence on the resisting an officer, use of a dangerous weapon charge, placing Stietz on probation for two years consecutive to the sentence on the other count. A judgment of conviction was entered, and Stietz filed a notice of intent to pursue postconviction relief the same day.
f 129. On April 14, 2016, the court of appeals affirmed Stietz's judgment of conviction. State v. Stietz, No. 2014AP2701-CR, unpublished slip op. (Wis. Ct. App. Apr. 14, 2016) (per curiam). On May 16, 2016, Stietz filed a petition for review in this court. On October 11, 2016, this court granted the petition.
III
I 130. The issues raised on appeal pertain largely to whether the circuit court erred in not providing certain jury instructions requested by Stietz.
*627 A circuit court has broad discretion in deciding whether to give a requested jury instruction. However, a circuit court must exercise its discretion in order "to fully and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence."
State v. Coleman, 206 Wis. 2d 199, 212, 556 N.W.2d 701 (1996) (citation omitted) (quoting State v. Vick, 104 Wis. 2d 678, 690, 312 N.W.2d 489 (1981)). Even if the circuit court errs, "an 'erroneous jury instruction warrants reversal and a new trial only if the error was prejudicial.' " Kochanski v. Speedway SuperAmerica, LLC, 2014 WI 72, ¶ 11, 356 Wis. 2d 1, 850 N.W.2d 160 (quoting Fischer v. Ganju, 168 Wis. 2d 834, 849, 485 N.W.2d 10 (1992)). Importantly, "an error relating to the giving or refusing to give an instruction is not prejudicial if it appears that the result would not be different had the error not occurred." Id. (quoting Lutz v. Shelby Mut. Ins. Co., 70 Wis. 2d 743, 751, 235 N.W.2d 426 (1975)).
¶ 131. I first address the circuit court's decision not to instruct the jury on self-defense. I then address the circuit court's decision not to instruct the jury on trespass.
IV
¶ 132. Stietz argues that the circuit court should have instructed the jury that he was privileged to defend himself against the wardens under certain circumstances.
¶ 133. The pattern jury instruction on self-defense entitled "Privilege: Self-Defense: Force Less Than That Likely to Cause Death or Great Bodily Harm—[Wis. Stat.] § 939.48" reads in part as follows:
*628 Self-defense is an issue in this case. The law of self-defense allows the defendant to threaten or intentionally use force against another only if:
• the defendant believed that there was an actual or imminent unlawful interference with the defendant's person; and,
• the defendant believed that the amount of force the defendant used or threatened to use was necessary to prevent or terminate the interference; and
• the defendant's beliefs were reasonable.
Determining Whether Beliefs Were Reasonable
A belief may be reasonable even though mistaken. In determining whether the defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense. The reasonableness of the defendant's beliefs must be determined from the standpoint of the defendant at the time of the defendant's acts and not from the viewpoint of the jury now.
Wis JI—Criminal 800 (footnotes omitted). Wisconsin Stat. § 939.48(1) (the statute referenced by the instruction) itself states:
A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that *629 such force is necessary to prevent imminent death or great bodily harm to himself or herself.
§ 939.48(1)[7]
f 134. As an initial matter, it was Stietz's burden to place self-defense in issue. See Head, 255 Wis. 2d 194, ¶ 111. "[I]f, before trial, the defendant proffers 'some' evidence to support her defense theory and if that evidence, viewed most favorably to her, would allow a jury to conclude that her theory was not disproved beyond a reasonable doubt, the factual basis for her defense theory has been satisfied." Id., ¶ 115 (emphasis added). On the other hand:
[T]he standard for giving a jury instruction on self-defense may, in some circumstances, be higher than the standard for admitting self-defense evidence at trial, because a defendant's claim of self-defense may be so thoroughly discredited by the end of the trial that no reasonable jury could conclude that the state had not disproved it.
Id. (first emphasis added).
¶ 135. Stietz argues that he is entitled to a self-defense instruction because the evidence viewed in the light most favorable to him showed that he had been having problems with trespassers; that on November 25, 2012, Stietz had been looking for trespassers; and that Stietz in fact encountered two "strangers dressed in blaze orange trespassing on his land" who "demanded his rifle." Stietz claims that at the time the wardens ordered him to disarm "it was reasonable for him to infer" based on the available information that *630 the wardens were "illegally trespassing hunters." Sti-etz adds that the strangers forcibly obtained his weapon and that one of the strangers pointed a handgun at him. Under the circumstances, Stietz contends, self-defense was warranted.
f 136. Stietz's argument fails. Stietz's assertion of self-defense was "so thoroughly discredited" by the close of evidence "that no reasonable jury could conclude that the state had not disproved it." Id. As the State explains in its brief:
It is undisputed that both wardens were wearing their issued uniforms: a "blaze orange" jacket; a DNR patch on the shoulder of each arm of the jacket; a DNR badge along either the middle zipper of the jacket or the left chest; and a "blaze orange" hat with a DNR patch.
The wardens did not carry long guns, which Warden Frost testified is "usually a give away as to us not being hunters." Further, Stietz's own testimony confirms that he heard one of the wardens say to him, "a Warden"; testimony self-evidently not negated by Sti-etz's contention that the statement was "kind of mumbled, not real loud." The circuit court correctly stated at the jury instruction conference that "[u]nder the circumstances, if [Stietz] didn't know [that Warden Frost and Warden Webster] were wardens, he should have, and he didn't have a right to self-defense against a police officer." See Wis JI—Criminal 800 ("In determining whether the defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense.").
¶ 137. Nor does rejecting Stietz's claim of self-defense require this court or the circuit court to im *631 properly weigh the evidence, as Stietz argues. As our case law makes clear, viewing evidence in the light most favorable to the defendant does not mean suspending one's disbelief to the point of absurdity. Cf. State v. Mendoza, 80 Wis. 2d 122, 153, 258 N.W.2d 260 (1977) ("Thus the question before us . . . is . . . whether a reasonable construction of the evidence will support the defendant's theory 'viewed in the most favorable light it will "reasonably admit o/from the standpoint of the accused." ' " (emphasis added) (quoting Ross v. State, 61 Wis. 2d 160, 172, 211 N.W.2d 827 (1973))). If "no reasonable jury could conclude" on the evidence presented that the State had failed to disprove a claim of self-defense, a jury instruction is not warranted. Head, 255 Wis. 2d 194, ¶ 115; cf. Mendoza, 80 Wis. 2d at 152-53. To take one hypothetical raised by the circuit court below that is not at all far off from the facts of this case, if a defendant is pulled over by a uniformed police officer at night and resists the officer, he cannot simply invoke the magic words of "self-defense" to obtain the corresponding jury instruction. Here, the circuit court properly exercised its discretion in refusing to instruct the jury that Stietz might have been acting in self-defense, in light of the fact that Stietz's claim had been sufficiently "discredited." Head, 255 Wis. 2d 194, ¶ 115. If anything, the wardens seem to have been defending themselves.
¶ 138. Regardless, even assuming that the circuit court should have instructed Stietz's jury on self-defense, such error was patently harmless; there is no doubt that even absent the error the result would have been the same. See Kochanski, 356 Wis. 2d 1, ¶ 11. This becomes evident when one reviews the crimes of which Stietz was acquitted and the crimes of which Stietz was convicted, in light of the facts of the case.
*632 ¶ 139. The interaction between the three parties is divisible into two parts: (1) the initial struggle between Stietz and the two wardens over Stietz's rifle; and (2) the prolonged standoff between the three during which the wardens pointed firearms at Stietz and Stietz pointed his firearm at Warden Webster.
¶ 140. Stietz was acquitted of resisting Warden Frost and of pointing a weapon at Warden Frost but convicted of resisting Warden Webster and of pointing a weapon at Warden Webster. In other words, this means that the jury was unwilling to assign guilt to Stietz regarding the initial struggle over Stietz's rifle, but concluded that Stietz was guilty with regard to the prolonged standoff. This is hardly shocking, given that during this second period: (1) Stietz continued to point his handgun at Warden Webster even after, by his own admission, he knew that the two officers were wardens; and (2) Stietz refused to surrender his firearm for over half an hour, despite being in the presence of multiple additional clearly-identified law enforcement officers cajoling him to submit peacefully.
¶ 141. Critically, in order to have convicted Stietz of resisting Warden Webster, use of a dangerous weapon, in violation of Wis. Stat. § 946.41(1), and intentionally pointing a firearm at Warden Webster, in violation of Wis. Stat. § 941.20(lm)(b), the jury had to have found, as elements of the crimes, that Stietz knew or had reason to know that Warden Webster was a law enforcement officer. More specifically, the elements of the crime of resisting an officer are:
1. The defendant resisted an officer.. . .
2. The officer was doing an act in an official capacity. . . .
3. The officer was acting with lawful authority. . . .
*633 4. The defendant knew that (officer) was an officer acting in an official capacity and with lawful authority and that the defendant knew (his) (her) conduct would resist the officer.
Wis JI—Criminal 1765 (emphasis added).
¶ 142. The elements of the crime of intentionally pointing a firearm at a law enforcement officer are:
1. The defendant pointed a firearm at or toward (name of victim). . . .
2. The defendant pointed the firearm at or toward (name of victim) intentionally. . . .
3. (Name of victim) was a law enforcement officer.
4. (Name of victim) was acting in an official capacity.

5. The defendant knew or had reason to know that (name of victim) was a law enforcement officer.

Wis JI—Criminal 1322A (emphasis added).
¶ 143. Consequently, even if the jury had been instructed regarding self-defense, it would not have made a difference. On the evidence presented, the jury rejected Stietz's claim that he did not know that Warden Webster was a warden and that Stietz's ignorance was justifiable. The jury's verdict makes clear that it carefully considered the evidence before it. Even assuming that omission of a self-defense jury instruction was error, this court should not upset that verdict for the purpose of providing an instruction that would not have had any effect.
¶ 144. Finally, Stietz could be read to argue that, aside from the discussion above, he had a right to defend himself against the wardens because they had no legal right to seize or disarm him. That is not the law. In Hobson, for example, this court abrogated the *634 common law privilege "to forcibly resist an unlawful arrest in the absence of unreasonable force." State v. Hobson, 218 Wis. 2d 350, 353, 577 N.W.2d 825 (1998). We " adopt [ed] the conclusion" of another state supreme court that had reasoned in part:
[T]he legality of a peaceful arrest should be determined by courts of law and not through a trial by battle in the streets. It is not too much to ask that one believing himself unlawfully arrested should submit to the office [r] and thereafter seek his legal remedies in court. Such a rule helps to relieve the threat of physical harm to officers who in good faith but mistakenly perform an arrest, as well as to minimize harm to innocent bystanders.
Id. at 379-80 (quoting Miller v. State, 462 P.2d 421, 427 (1969)). We also quoted Judge Learned Hand, who eloquently noted that "[t]he idea that you may resist peaceful arrest. . . because you are in debate about whether it is lawful or not, instead of going to the authorities which can determine [lawfulness], . . . [is] not a blow for liberty but, on the contrary, a blow for attempted anarchy." Id. at 373 (alterations in original) (quoting Discussion of Model Penal Code (Tentative Draft No. 8), 35 A.L.I. Proc. 222, 254 (1958)). And, finally, we analogized to the Supreme Court's discussion in Walker v. City of Birmingham, where the Court referenced a "rule of law . . . reflecting] a belief that in the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion." Id. at 378 (quoting Walker v. City of Birmingham, 388 U.S. 307, 320-21 (1967)).
f 145. Here, Warden Frost and Warden Webster were not even arresting Stietz. As will be discussed in greater detail below, they were lawfully investigating *635 potential hunting violations. For their own safety and for the purpose of ensuring compliance with applicable laws, the wardens peaceably asked or ordered Stietz to disarm. Stietz should have surrendered his firearm rather than resist this demand, lawful or not. When he failed to respond to the verbal instruction, unjustifiably intensifying the pressures of the situation and the wardens' concerns for safety, the wardens reasonably attempted to obtain the weapon against Stietz's will. Once again, Stietz had no right to forcibly resist the actions of the wardens.
¶ 146. Much as some might wish it to be so, we are no longer living in the Wild West. Disputes between law enforcement officers and the citizens they serve are resolved in court. No matter how in the right they may be, members of the general public have no authority to take matters into their own hands. Law enforcement officers make mistakes of law or fact every day. There are judicial remedies for such errors, such as suppression or even an independent lawsuit. Stietz could have availed himself of such remedies rather than risking his own life and the lives of Warden Frost and Warden Webster. His argument that he was entitled to forcibly resist must be rejected.[8]
*636 V
¶ 147. Stietz next argues that the circuit court erred in declining to instruct the jury regarding the issue of whether the wardens might have been trespassing on Stietz's property. According to Stietz, the issue is relevant because if the wardens were trespassing, he argues, they were not acting "in an official capacity" and "with lawful authority," one or both of which are elements of the crimes of which Stietz was convicted. See Wis. Stat. § 946.41(1) ("Except as provided in subs. (2m) and (2r), whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor." (emphasis added)); Wis. Stat. § 941.20(lm)(b) ("Whoever intentionally points a firearm at or towards a law enforcement officer, a fire fighter, an emergency medical technician, a first responder, an ambulance driver, or a commission warden who is acting in an official capacity and who the person knows or has reason to know is a law enforcement officer, a fire fighter, an emergency medical technician, a first responder, an ambulance driver, or a commission warden is guilty of a Class H felony." (emphasis added)).
¶ 148. Stietz's argument is meritless. It should be noted at the outset that the court of appeals below concluded that the entry was constitutional under the open fields doctrine. Stietz, unpublished slip op., ¶¶ 15-18; see also, e.g., Florida v. Jardines, 569 U.S. _, 133 S. Ct. 1409, 1414 (2013) ("The Fourth Amendment does not, therefore, prevent all investigations *637 conducted on private property; for example, an officer may (subject to [Katz v. United States, 389 U.S. 347 (1967)]) gather information in what we have called 'open fields'—even if those fields are privately owned —because such fields are not enumerated in the Amendment's text."). Stietz does not appear to contest this conclusion (though he does argue that the wardens lacked reasonable suspicion to enter the property, a matter discussed below).
1 149. Further, a number of statutes establish that the wardens possessed statutory authority to enter Stietz's property. For instance, Wis. Stat. § 23.10(1) provides in part:
The department of natural resources shall secure the enforcement of all laws which it is required to administer .... The persons appointed by said department to exercise and perform the powers and duties heretofore conferred and imposed upon deputy fish and game wardens, shall be known as conservation wardens.
§ 23.10(1) (emphasis added).
¶ 150. Next, Wis. Stat. § 29.921, entitled "Warrants; arrests; police powers," provides in part:
The department and its wardens[9] • • • may arrest, with or without a warrant, any person detected in the actual violation, or whom the officer has probable cause to believe is guilty of a violation of any of the laws cited in this subsection,[10] whether the violation is punishable by criminal penalties or by forfeiture, *638 and may take the person before any court in the county where the offense was committed and make a proper complaint. For the purpose of enforcing any of the laws cited in this subsection, any officer may stop and board any boat and stop any vehicle, if the officer reasonably suspects there is a violation of those sections.
§ 29.921(1).
¶ 151. Wisconsin Stat. § 29.924, entitled "Investigations; searches," provides in part that "[t]he department and its wardens shall, upon receiving notice or information of the violation of any laws cited in s. 29.921(1), as soon as possible make a thorough investigation and institute proceedings if the evidence warrants it." § 29.924(1). And Wis. Stat. § 29.931 orders "[t]he department and its wardens" to "seize and confiscate any wild animal, carcass or plant caught, killed, taken, had in possession or under control, sold or transported in violation of any of the laws for which the department and its wardens have enforcement authority under s. 29.921." § 29.931(1).
f 152. This court has already recognized that "[t]he State Conservation Commission and its deputies are given rather broad police powers in the enforcement of the fish and game laws of this state." State v. Leadbetter, 210 Wis. 327, 330, 246 N.W. 443 (1933).[11] There is much to commend the legislature's approach in this regard. The DNR is tasked with enforcing a targeted set of laws, the violation of which will often *639 occur on private land. While wardens must of course act within constitutional constraints, the statutory limitations on their actions are relatively permissive and enable the DNR to effectively address violations of hunting and fishing laws, among others.[12]
¶ 153. In this case, the wardens possessed reasonable suspicion that hunting violations were occurring. On the last day of deer hunting season near the *640 end of hunting hours, the wardens spotted a vehicle parked out in a field. Warden Webster thought the vehicle might be abandoned, whereas Warden Frost thought the vehicle might have belonged to a hunter. Warden Frost's suspicions were confirmed when hunting-related items were spotted in the vehicle: an empty gun case, a camouflaged seat, and scent killer spray. By that time hunting hours were over. The wardens were entitled to investigate whether the individual to whom the car belonged was indeed engaged in illegal hunting.[13] As the jury's verdict suggests, the wardens were indeed acting in an official capacity and with lawful authority. The circuit court did not err in declining to instruct the jury regarding the law of trespass.[14]
¶ 154. In sum, Stietz's arguments on appeal should be rejected.[15]
VI
¶ 155. DNR wardens are tasked with the protection of the natural resources of this state and the enforcement of a special subset of our laws. See, e.g., Wis. Citizens Concerned for Cranes & Doves v. DNR, *641 2004 WI 40, ¶ 23, 270 Wis. 2d 318, 677 N.W.2d 612 ("This court has previously recognized that the DNR has broad authority as custodian of Wisconsin's wildlife to enact regulations that maintain a balance between conserving and exploiting the state's wildlife."). In order to catch offenders, DNR wardens must sometimes enter private lands; the element of surprise is critical to their unique law enforcement mission.
¶ 156. In this case, Warden Frost and Warden Webster entered Stietz's land and questioned Stietz to verify whether illegal hunting was taking place. Landowners and hunters alike depend on DNR wardens to engage in this type of activity. Many landowners do not have the resources to police their own land for illegal hunters. Nor would this be a desirable approach: if landowners policed their own land looking for trespassers (as Stietz was allegedly doing in this case), the result would be a chaotic free-for-all. The work of DNR wardens thus keeps both hunters and landowners safe. Unfortunately, the court hinders the ability of DNR wardens to act in the way they have traditionally been required to act.
f 157. As the circuit court noted, Stietz is fortunate that he was not shot when he drew his handgun on Warden Frost and Warden Webster. He is fortunate the wardens showed such incredible restraint. But a jury concluded on the evidence that Stietz was not blameless—that he should not have resisted Warden Webster and pointed a firearm at him. There is nothing unjust about the proceedings that occurred below; the circuit court was within its discretion in declining to instruct the jury on self-defense and trespass. Accordingly, I would reject Stietz's claims and affirm the decision of the court of appeals.
*642 ¶ 158. For the foregoing reasons, I respectfully dissent.
¶ 159. I am authorized to state that Justice MICHAEL J. GABLEMAN joins this opinion.

 Stietz contends that the circuit court additionally erred in barring him from arguing that the wardens were trespassers. The reasoning set forth in my discussion of the circuit court's decision on the trespass jury instruction disposes of this issue, so I will not otherwise address it. Further, given my analysis, I need not address the State's argument that because some of the property at issue in this case was owned by Stietz's neighbor, Stietz lacks standing to assert that the wardens were trespassing. For purposes of this writing, I will refer to property at issue as Stietz's property.

 Stietz also briefly makes a Second Amendment claim. As I will discuss, I would reject that claim as undeveloped.

 Proof that the court is stretching to reach an outcome is the court's incomplete and misleading presentation of the facts.

 Warden Webster's testimony differs to some extent regarding the order of the questions asked and the identity of the questioner. These variations will not be discussed.

 Deputy Broge testified that Stietz lowered his weapon at about 5:20 p.m. and that Stietz put his weapon on the ground at about 6:00 p.m.

 According to Stietz, the orange vest in his pocket had been placed there days before.

 Stietz requested Wis JI-Criminal 800 as well as "alternative self-defense formulations." Stietz does not develop arguments suggesting that any differences between these formulations are material for purposes of this appeal.

 Stietz also asserts that the wardens' actions "violated Stietz1 Second Amendment rights and precludes his prosecution." But Stietz does little more than cite the Second Amendment and its counterpart in the Wisconsin Constitution. I agree with the State that Stietz's argument is undeveloped. Stietz undeniably possesses important constitutional rights to keep and bear arms. But "[l]ike most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." District of Columbia v. Heller, 554 U.S. *636 570, 626 (2008). Stietz must do more than simply cite a constitutional provision and wait for the court to formulate arguments on his behalf.

 See Wis. Stat. §24.01 ("In chs. 23 to 29, unless the context requires otherwise or unless otherwise defined:. . . (3) 'Department' means department of natural resources. . .. (11) Warden1 means conservation warden, and includes county, special and deputy conservation wardens.").

 The subsection references "any law enumerated in ss. 23.50(1), 167.31, 346.19, 940.24, 941.20, 948.60, 948.605 and *638 948.61." Wis. Stat. § 29.921(1). Wisconsin Stat. § 23.50(1) in turn references, among other things, "violations of... this chapter, and chs. 26 to 31." This would include Wis. Stat. ch. 23 ("Conservation") and Wis. Stat. ch. 29 ("Wild animals and plants").

 The conservation commission preceded the Department of Natural Resources. See, e.g., Prefatory Note, 1997 Wis. Act 248.

 Stietz points to Wis. Stat. § 23.58(1), a provision in that chapter of the Wisconsin Statutes entitled "Conservation," which states in part that "an enforcing officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a violation of' certain enumerated statutes. § 23.58(1) (emphasis added). Stietz argues that the wardens were not in a "public place." But the putative inapplicability of § 23.58(1) proves little. That subsection applies broadly to "enforcing officer[s]." Id. Unlike the statutes cited that apply specifically to "the department and its wardens," § 23.58(1) applies to, among others, "a person who has authority to act pursuant to a specific statute." See, e.g., State v. Iverson, 2015 WI 101, ¶ 41, 365 Wis. 2d 302, 871 N.W.2d 661 (state troopers). Thus, given that many different types of law enforcement officers fall within the terms of § 23.58(1), the legislature may sensibly have wished to circumscribe the scope of the authority the subsection provides.
Stietz also suggests that Wis. Stat. § 29.924(5) supports his argument. That subsection reads as follows: "Access to Private Land. The department may, after making reasonable efforts to notify the owner or occupant, enter private lands to retrieve or diagnose dead or diseased wild animals and take actions reasonably necessary to prevent the spread of contagious disease in the wild animals." § 29.924(5). Those circumstances were not present here. But section 29.924(5) does not unambiguously purport to provide the only circumstances under which wardens may enter private land. Section 29.924(5) would appear to be required as an independent source of authority because the spread of contagion will not necessarily be tied to any legal violation on the part of a landowner.

 The wardens were probably correct in thinking that illegal hunting was taking place. Stietz was found in "full camouflage" with blaze orange in his pocket and carrying two weapons. Numerous hunting-related items were found in his vehicle.

 As explained, the circuit court also barred Stietz from arguing that the wardens were trespassing, and Stietz objects to that ruling. For the reasons already stated, the circuit court's decision was not in error.

 Stietz characterizes many of the errors that occurred below as violating his constitutional right to present a defense. Assuming Stietz has correctly invoked the right, that invocation fails because Stietz's individual arguments, as shown, fail.